172 Pa. Superior Ct. 125 (1952)
Commonwealth
v.
Nelson, Appellant.
Superior Court of Pennsylvania.
Argued October 8, 1952.
November 12, 1952.
*127 Before RHODES, P.J., HIRT, RENO, DITHRICH and ROSS, JJ. (ARNOLD and GUNTHER, JJ., absent).
Victor Rabinowitz, with him Louis F. McCabe, for appellant.
William F. Cercone, Assistant District Attorney, with him James F. Malone, District Attorney, for appellee.
The facts are stated in the opinion, by MONTGOMERY, J., of the court below, BAUER, P.J., ADAMS and MONTGOMERY, JJ., as follows:
Following his conviction on January 30, 1952 for violating the Sedition Law of this State as presently stated in Section 207 of The Penal Code, adopted June 24, 1939, P.L. 872 (18 P.S. 4207), the defendant filed motions for a new trial and in arrest of Judgment which are now before us for disposition.

I. This court has jurisdiction.

One of the reasons asserted in support of the motions is, that this Court is without jurisdiction because the Federal Government has preempted this field of *128 jurisdiction and therefore has exclusive jurisdiction. This reason is untenable. There is no question that where jurisdiction is exclusive in the Federal Government or where its jurisdiction is supreme in a field where the states may act in the absence of Federal legislation, the state may not interfere by legislation it may pass: Hines v. Davidowitz, 312 U.S. 52, in which case it was held that the registration of aliens is within such fields. The Alien Registration Act of 1940, June 28, C 439, 54 Stat. 670, therefore, supersedes the Pennsylvania Act of 1939, P.L. 74. The reason for this is that nationals of other countries everywhere as well as our citizens abroad are protected by treaties which are in the exclusive hands of the Federal Government under our Constitution. However, since the defendant is a naturalized citizen of this country, the matter of treaty is not involved; and further, lack of citizenship is no defense in prosecutions under state criminal laws. Therefore, the Alien Registration Act does not supersede the legislation under which defendant was prosecuted.
Defendant argues further that the Smith Act and the McCarran or Internal Security Act together preempted this same field and therefore precluded the Commonwealth of Pennsylvania from acting.[1] These Acts are very broad and include the protection of the national as well as the state government from the ravages of Communism. However, that alone does not nullify the state legislation. As we have just stated, that nullification comes about only when the Federal *129 Government's jurisdiction is exclusive or when it is supreme, and in the latter case the Federal Government must expressly or by necessary implication indicate its intention of superseding or precluding the action of the states, 22 C.J.S. Sec. 16 (p. 65). We find nothing in the Smith Act or the McCarran Act, expressly precluding the states from acting and we do not read in the Acts any necessary implication to that effect. On the contrary, the latter Act expressly provides (Sect. 5017, U.S.C.A. 796) the following: "The foregoing provisions of this subchapter shall be construed as being in addition to and not in modification of existing criminal statutes."
We are of the opinion that the legislation upon which this prosecution is based comes under the head of "concurrent jurisdiction" as described in U.S. v. Lanza, 260 U.S. 377, wherein the Court said: "We have here two sovereignties, deriving power from different sources, capable of dealing with the same subject-matter within the same territory. Each may, without interference by the other, enact laws to secure prohibition, with the limitation that no legislation can give validity to acts prohibited by the Amendment. Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other." Also, Westfall v. U.S., 274 U.S. 256, wherein the Court said: "Of course an act may be criminal under the laws of both jurisdictions."
In Commonwealth v. Blankenstein, 81 Pa. Superior Ct. 340, our Superior Court, in speaking of the Pennsylvania Sedition Act, said: "No one, whether he be alien or citizen, has any warrant in the Constitution to overthrow its authority by violence, and the right to counteract violence includes the power to prohibit conduct the purpose and effect of which is to produce public disorder and antagonism against the State." This *130 same right is recognized by our laws even when applied to the individual citizen. His right of self-defense justifies homicide; likewise, the state need not depend upon the vigilance and action of the Federal authorities and thereby risk its own existence. The right of the state to exercise its police power to protect itself is as important to it as the same attribute of the Federal Government and in the absence of any delegation of that right by the state to the Federal Government it would still remain with it under the Tenth Amendment to the U.S. Constitution.[2] We find nothing in our Constitutions that would indicate an intention of depriving the Commonwealth of Pennsylvania of that right or the transferring of it to the Federal Government unless it be Article I, Sect. 8, Clause 15 of the United States Constitution which delegates to Congress the right "to provide for calling forth the militia to execute the laws of the Union, suppress insurrection and repel invasion". In our opinion, this provision does not lend itself to an interpretation that the state is deprived of the right to make criminal acts that could and are intended to cause public disorder even though such acts might eventually lead to insurrection. Sect. 102, Title II of the McCarran Act also supports this position because it is therein provided that the declaration by the President of "internal security emergencies" is contingent upon the happenings of those things mentioned in the foregoing Constitutional provision, towit: "invasion and insurrection and declaration of war."[3]
*131 The police power is the greatest and most important attribute of government; on it the very existence of the state depends. If the exercise of the police power should be in irreconcilable opposition to a constitutional provision or right the police power would prevail. See Commonwealth v. Widovich et al., 93 Pa. Superior Ct. 323 and 295 Pa. 311, (318), and cases therein cited. The importance of the matter dictates that jurisdiction be concurrent so that every means of protection is available.
In this connection, we are of the further opinion that the acts of defendant within the Commonwealth of Pennsylvania were not such as to be: "* * * interwoven with contemporary national policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government * * *." Nor do we place any merit upon the further argument that the federal field has been invaded because certain U.S.S.R. information bulletins presented in evidence, were published by the Embassy of the Union of Soviet Socialist Republics and circulated under an agreement between the Soviet Union and the United States. These pamphlets did not form the basis for the prosecution; they were incidental thereto and *132 were offered merely to throw light on the defendant's intentions in his use of other literature upon which the indictment depended. He was not prosecuted for circulating these bulletins and there was therefore no violation of the agreement between the two governments; or the invasion of any field in which the jurisdiction of the national government was exclusive or supreme.

II. The Sedition Act is Constitutional.

We are next asked to rule upon the constitutionality of the Act involved and to ignore the decisions of our Appellate Courts particularly Commonwealth v. Widovich, 93 Pa. Superior Ct. 323, reviewed by the Supreme Court at 295 Pa. 311; Commonwealth v. Lazar, 103 Pa. Superior Ct. 417; Commonwealth v. Blankenstein (supra) and others. The answer to this argument is found and clearly stated in the case of Townsend Trust, 349 Pa. 162: ". . . a lower court has no right to ignore the latest decision of the Superior Court of this Commonwealth on an issue which has been squarely decided. Until that decision should be overruled by the Supreme Court, it is still the law of this Commonwealth, regardless of the decisions of any other court in the country, including the Federal courts." This rule is also supported by Statute, in Act of 1895, June 24, P.L. 212 (Sect. 10), 17 P.S. 198, and is applicable to constitutional questions: Gerlach v. Moore, 243 Pa. 603; and Keator v. Lackawanna County, 292 Pa. 269. It is only inapplicable when other statutes have been the subject of consideration; Commonwealth ex rel. Margiotti v. Lawrence et al., 326 Pa. 526; Heisler v. Thomas Colliery Co., 274 Pa. 448.
In the absence of any decision of our Pennsylvania Appellate courts contrary to or in modification of the Widovich (supra) and Lazar et al (supra) cases, we *133 must, therefore, accept them as establishing the constitutionality of the Act now before us.
However, defendant argues that since Par. (c) of the Act was excepted from the discussion in the Widovich case (no charge having been laid thereunder in that indictment) there is no precedent established by an Appellate Court that is binding and therefore we should pass on the constitutionality of that particular paragraph since certain counts of the present indictment (2, 3, 4 and 8) are based upon it. In support of the argument, a portion of the charge to the jury by O'BRIEN, J. in the trial of Onda and Dolsen under this present indictment is offered. The substance of the offered matter is that Sect. (c) does not charge a crime and is in violation of the Constitution of the United States.
At the outset, it can be said that the charge of a trial judge to the jury in any case is not a decision. It can also be further said that decisions of courts of equal jurisdiction are persuasive and not binding: Gyger v. Phila. City Pass. R. Co., 17 Phila. 86.
However, since we are now asked to pass on the constitutionality of Sect. (c) and no statements of our Appellate Court have been presented to us, we shall do so.
The draftors of our Sedition Act drew fine distinctions in the ways the crime could be accomplished. The accused by the use of words, writing or conduct must intend to: (a) Cause an outbreak or demonstration of violence against government. (b) To encourage others to do so. (c) To incite and encourage others to commit acts with the view of bringing government into hatred and contempt. (d) To incite and encourage others to do injury to public officers or damage public property. The element not expressly stated in (c) *134 that is present in the other three is the accomplishment of actual overthrow or harm to government, or injuries to public persons or damage to public property. We fail to see how this distinction brings such acts within the protection of the constitutional provision assuring freedom of speech, press or assembly. Just as surely, as harm to government is intended in (a), (b) and (d), it is intended and anticipated in (c). To subject a person or a government to the hatred and contempt of his neighbors or its governed is to invite an attack upon him or it. The venom attached to such emotions leads to the violence and show of force that the Statute intends to prevent and the thing against which government may and must defend itself before it occurs. There can be no question that their effect would be to undermine the stability of government and lead to its overthrow by force. We, therefore, hold that such a provision, par. (c), does state a crime and is a constitutional enactment for the same reasons as stated in the Lazar and Widovich cases (supra). To bring government into hatred and contempt or to incite others to commit overt acts is to abuse the privileges of criticizing and advocating changes which are protected by our constitution.
The Trial Judge did not rewrite the Statute, or disregard the Widovich and Lazar cases in requiring a presently or proximate operative intent to be found by the jury to sustain a conviction. The Lazar case stated that: ". . . whether the appellant was dealing with the present or future is immaterial . . ." (p. 421)
The Trial Judge by charging that: "However, you must find the results intended were for the present or in the future as same or as speedily as circumstances should permit; not at some uncertain time in the distant future." merely limited the matter to a definite basis rather than some theoretical or speculative *135 sphere. This was beneficial to the defendant, not prejudicial.

III. The indictment meets constitutional requirement.

In addition to the objection made to the constitutionality of the Act, defendant makes additional objections to the indictment, asserted as constitutional objections based on the failure to sufficiently state the crime or crimes described by the Statute.
Counts six to twelve are first referred to in defendant's brief and the objection is that "possession" of literature is the offense charged, whereas "advocacy" is the crime the Statute forbids. However, an examination of these counts reveals that "possession" is only one part of the charge, "sale, distribution, etc.," being also alleged. There are, therefore, sufficient allegations in these counts to describe the crimes of the statute. However, we are not inclined to the ruling that possession is not part of the crime; in the Widovich case the indictment contained the same allegations including "possession" (see 93 Pa. Superior Ct. at 327).
Insofar as specific intent is concerned, the indictment is adequate and was more informative than the indictments in Commonwealth v. Belevsky, 79 Pa. Superior Ct. 12 and other cases hereinbefore mentioned. It meets the requirements of the Constitution that it furnish sufficient information to enable defendant to properly prepare his defense and it is sufficiently precise to protect him from a second prosecution for the offenses charged.
In this connection, defendant objects to the indictment for the further reason that an amendment was allowed changing the date from July 19, 1950 "and on diverse times before and since that date" to August 31, 1950 "and on diverse times before and since that *136 date." Amendments of dates to conform to the evidence are permissible under Sect. 11, Act 1860, March 31, P.L. 427 (19 P.S. 431) when the date is not of the essence; Commonwealth ex rel. Bandi v. Ashe, 367 Pa. 234. The amendment was made to include the last date on which the defendant was associated with the literature, bookstore, etc., as shown by the evidence. It did not set up a separate crime or one not considered by the Grand Jury on October 17, 1950 when that body acted; and, therefore, the amendment violated no constitutional rights defendant may have. There is nothing in the record to indicate any surprise on the part of defendant. The indictment both before and after the amendment gave notice to defendant that subsequent as well as prior events within the period of the indictment confronted him.

IV. The evidence supports the verdict.

There is substantial evidence to establish the following facts:
For some time prior to August, 1948 and continuously thereafter until August 31, 1950 (when its office was padlocked and the contents seized) the Communist Party, U.S.A. maintained offices and a bookstore in the Bakewell Building on Grant Street in the City of Pittsburgh; the Communist Party U.S.A. is not a legal political party but is part of or affiliated with the Communist International of the Soviet Union and its aims and purposes are to accomplish the overthrow of the Government of the United States and its constituent governments including that of the Commonwealth of Pennsylvania by force and violence; defendant has been for many years a member of the Communist Party, U.S.A.; in August of 1948 he arrived in Pittsburgh and assumed the position and duties of paid district organizer and chairman of the Communist Party of Western Pennsylvania; and as such maintained his office *137 in the Bakewell Building headquarters; he proceeded to organize the party in Western Pennsylvania; his authority was complete and covered recruiting drives for members, educational discussions, infiltration into industry, fraternal and educational, religious and other groups, sale and distribution of literature of the Communist Press and the Daily Worker and the works of Marx and Engels, Lenin, Stalin and other Russian writers; the conduct and reports of meetings, preparation of budgets, the collection of contributions and the operation of the headquarters; the books and other articles sold and otherwise disseminated from the headquarters under the defendant's control and supervision were such as to be seditious in themselves or were such as could be used for purposes described by the Pennsylvania Sedition Act as seditious; the defendant intended that the dissemination of the books and other literature should accomplish those results which the Sedition Act sought to prevent; large quantities of such material as well as maps of Russia, pictures of Russian officers were found publicly displayed and seized in the headquarters of defendant when it was searched under authority of a Search Warrant on August 31, 1950; defendant's activities, supervision and authority, as aforesaid, was exercised by him continuously from August 1948 until August 31, 1950, and during said period there was sold and otherwise disseminated from said headquarters the books and literature aforementioned.
Such a set of facts is similar to those found in the Widovich case in which much of the same literature as concerns us formed the basis for the indictment; and the activities of the defendants therein during the two year period before the indictment was drawn were comparable to the actions of the present defendant. Here, he was a member chairman and district organizer; *138 there, they were active members and leaders and at times served as secretary, all the while distributing the books and pamphlets aforementioned, including the Daily Worker. The present defendant's motives and intention to accomplish sedition is supported by adequate evidence relating to his actions before the period of the indictment as well as during it; likewise, as to the purposes of the Communist Party, U.S.A. and the Pittsburgh group affiliated with it.
Defendant argues that since there is no evidence that places him in the headquarters on July 19, 1950, the original date set forth in the indictment or on August 31, 1950, the date established by the amendment; and further since there is no evidence that he committed any acts forbidden by the Statute on any other specific day within two years of the founding of the indictment, viz., within the two-year period immediately prior to October 17, 1950, his conviction cannot stand. In this connection, his counsel relies strongly on the case of Commonwealth v. Dingman, 26 Pa. Superior Ct. 615. However, our analysis of that case supports rather than unsettles the verdict.
The defendant in the Dingman case was charged with larceny of oil which he extracted from the owners' pipelines by means of a T connection he had made, controlled by a valve which diverted the oil from the owners' lines into that of the defendant. The device was discovered and by certain tests it was determined that after the device was removed the flow of oil into the owners' lines increased 11.10 barrels per day. The defendant was not present but was later arrested and charged with stealing 2000 barrels of oil "on the 7th day of November 1903", which was the day of discovery. In sustaining the verdict, the Court said: "There is authority for holding that the construction of the device with the intention of using it for the purpose of *139 a continuous apparent increase in the production of the wells, and the various takings of oil, as opportunity offered, in pursuance of such intention, are all to be considered as one transaction and a continuing offense: Regina v. Bleasdale, 2 C. & K. 765; The Queen v. Firth, L.R. 1 C.C. 172; 11 Cox C.C. 234. If this case be so regarded, then it was competent for the commonwealth to prove all that the defendant had done during the months that his device was in operation as a part of the offense with which he was charged. Even, however, if the appellant was guilty of a complete and distinct offense every time he placed his temporary pipe in position and turned the cock which permitted the oil to flow from the lines of the company, the evidence to which the defendant objected was competent upon the trial of this indictment."
Applying the analysis to the present case, it can readily be stated that the defendant had adapted a means, to-wit, the headquarters and bookstore and the organization he had developed through which there was disseminated material that could and was intended to accomplish sedition as described by the Act; or as stated by the Act  defendant by "conduct individually or in connection or combination with any other person" (namely Dolsen, Onda and others who worked therein) committed the forbidden acts. As in the Dingman case, he was not present at the particular time alleged in the indictment but this would not be fatal since the agency or means he utilized was in operation at the time alleged; and there is sufficient evidence to prove it was in operation both on July 19 and August 31, 1950 and continuously for at least two years before those dates. Therefore, the defendant could be convicted as committing a continuing crime or a separate one on August 31, 1950 as specified in the indictment. See Commonwealth v. Heller, 80 Pa. Superior Ct. 366 *140 for another example of a continuing offense. Dennis v. U.S., 341 U.S. 494, (71 S. Ct. 857) also covered an extended period.
Defendant argues further that other essentials of the crime have not been established, viz., (1) Specific intent to accomplish the evil (2) A presently operative intent or "as soon as circumstances will permit" (3) Clear and present danger (4) The Act must be one not protected by the first amendment.
Answering this argument seriatum it can be said that intent may be inferred as well as expressed (Widovich case, 295 Pa. 311 (p. 319)) and in some of the offenses the intent was declared by the Legislature by the doing of things regardless of the actor's actual intention Sections (e), (f) and (g). In those instances where it is required to be proved, there is ample evidence describing defendant's previous acts and declarations and also his position, purposes and acts during the indictment period to justify a finding of specific seditious intention.
We have previously discussed the matter of "presently operative" intentions and shall not repeat our discussion.
The question of "clear and present danger" was answered by the court as a matter of law in similar fashion, upon similar evidence and for similar reasons as present in the case of Dennis v. United States (supra). The question is further answered by the Lazar case, which holds similar evidence sufficient to sustain a conviction.
Lastly, the first amendment does not protect such acts (Widovich) (Lazar) (Blankenstein) supra.
We shall not review the evidence further. Most of defendant's brief is devoted to criticizing witnesses and attacking their credibility, and to the weight of the evidence. Such matters were for the jury. Likewise, *141 with the interpretations to be placed on the literature offered in evidence. The same literature has been found in other cases to be seditious or such as to be used to accomplish sedition and to repeat the discussions of those other cases would add nothing. In the present case, the literature referred to in the indictment was explained and interpreted by learned witnesses familiar with it representing both viewpoints. The jury had the benefit of their opinions as well as the opportunity to examine the literature. They found it such as to form the basis of a conviction on all counts. We see no reason now why we should review it in order to rule that defendant's interpretation is correct and that it cannot form the basis for conviction because it is historical or otherwise and not seditious or an instrument through which sedition could be accomplished by a person so intending.
However, the conviction under Sect. (h) of the Statute relating to membership in the organization having seditious policies or purposes requires some consideration. The Statute provides: "The word `sedition,' as used in this section, shall mean: * * * (h) Organizing or helping to organize or becoming a member of any member of any assembly, society, or group, where any of the policies or purposes thereof are seditious as hereinbefore defined." It is recognized that defendant's membership in the Communist Party, U.S.A. antedated the period of the indictment. It must also be recognized that in view of our prior discussion, the Communist Party, U.S.A. was an organization having seditious policies and purposes.[4] The evidence also establishes that the defendant was in Allegheny County to organize the branch of the Communist Party in Western *142 Pennsylvania. Defendant, regardless, argues that this provision (h) must be limited to formulating or creating the Communist Party, U.S.A. initially which was done elsewhere and beyond the period of the indictment. We do not agree.
It is noted that the provision includes assembly, society, or group. This is broad enough to include the Pittsburgh office and bookstore and the group surrounding the defendant here, including the branch in Western Pennsylvania; and is not confined to the international or national unit of the Communist Party. Defendant was the executive head of the group in Pittsburgh which included himself, Dolsen, Onda, Carrothers, and others. That group was being constantly organized and enlarged under his leadership, and was operating on July 19, 1950 and August 31, 1950 as well as during the other days of the indictment period. The evidence is sufficient to show its motives and purposes were similar to the Communist Party of the U.S.A. Defendant's main purpose in Pittsburgh was to organize and this was a constant activity and not a completed act at any particular time. We, therefore, hold that the provisions of Section (h) were violated.

V. The Defendant was not deprived of his right to counsel guaranteed by the Fourteenth Amendment to the Federal Constitution.

The history of this case is the answer to this argument. The defendant from the beginning had counsel when he desired it, and when he lacked counsel, it was likewise his desire, although he has made great pretense that this is not so. An examination of the papers on file discloses representation as follows:
Date, Sept. 8, 1950. Description, Petition for Writ of Habeas Corpus. Appearance, Hymen Schlesinger.
*143 Date, Dec. 22, 1950. Description, Petition to quash indictment. Appearance, Hymen Schlesinger, Sylvia Schlesinger, N.D. Davis.
Date, Dec. 28, 1950. Description, Petition to travel to New York to consult with his superiors in the Communist Party  to consult with counsel there in preparation for hearing before Congressional Committee  and to Butler, Pa., to consult with Hymen Schlesinger for pre-trial proceedings in preparation for this trial set for Jan. 2, 1951. Appearance, Hymen Schlesinger, Sylvia Schlesinger.
Date, Jan. 2, 1951. Description, Motion for Bill of Particulars. Appearance, Hymen Schlesinger, John T. McTernan.
Date, Sept. 6, 1951. Description, Service of Petition of District Attorney to cancel bond*. Appearance,
* Accepted by H. Schlesinger with note: "Steve Nelson is acting as his own attorney in this case".
Date, Sept. 10, 1951. Description, Order to permit defendant to travel made on information received from attorneys McTernan and Pollitt. No appearance.
Date, Sept. 10, 1951. Description, Motion to dismiss petition to cancel bond an answer. Appearance, Hymen Schlesinger, P.h.v.
Date, Sept. 27, 1951. Description, Petition for continuance of trial date. Appearance, Louis F. McCabe, Philadelphia, Pa.
Date, Sept. 28, 1951. Description, Motion for physical examination. Appearance, Hymen Schlesinger, P.h.v.
Date, Oct. 8, 1951. Description, Petition to travel to consult with Atty. Darlington Hoopes in Reading, Pa. thence to Wilkes-Barre  Scranton  Philadelphia and New York. No appearance.
*144 Date, Nov. 20, 1951. Description, Motion to travel to New York and Philadelphia to interview lawyers. No appearance.
Date, April 14, 1952. Description, Oral argument and brief in support of motion for new trial and in arrest of judgment. Appearance, Basil R. Pollitt, New York City, N.Y.
In addition: (1) Defendant's previous trial started with John T. McTernan, Esq., and Hymen Schlesinger, Esq., as his attorneys. He then declined their services and proceeded alone: (2) In his petition to the Supreme Court for Writ of Prohibition, he recited that he had interested Howard Meldahl of Charleston, West Virginia, and Louis Fleischer and Aubrey Grossman of New York. Mr. Meldahl appeared before the Trial Judge early in December before the date on which the case was listed for trial and advised him that he was undertaking to represent Nelson but had an important case in West Virginia that was to commence December 17, 1951 and would last a week. Mr. Meldahl was told it would be possible to accommodate him. However, he did not appear again and the only further information concerning him came from the defendant on December 19 that Mr. Meldahl could not appear until next Tuesday (R. 441) which would have been Christmas Day. However, although the trial was postponed from Friday, December 21 until Wednesday, January 2, 1952, Mr. Meldahl did not appear at any time.
On December 19, 1951, Louis Fleischer came from New York and consented to enter the case but when refused a sixty-day postponement, declined.
In addition, the Court offered defendant the services of four members of the Allegheny County Bar, namely, Albert Martin, Esq., William Doty, Esq., Carl Blanch-field, Esq., and Harry Glick, Esq. Mr. Martin later declined but Mr. Doty and Mr. Blanchfield were willing *145 to proceed. However, the defendant declined their services. Mr. Glick requested a thirty-day postponement but was informed he would have five days and additional time over the holiday. However, he did serve the defendant in the selection of the jury, following S. Pearse O'Connor, Esq., who started to do so at the court's request, but who had to retire due to being engaged in another case. Again, before the opening of the case to the jury, the Court offered the defendant the services of Mr. Glick (R. 441-442) but they were declined.
The defendant was not alone in his trial; Mr. Schlesinger was present in the court room many times for long intervals; representatives of the Abraham Lincoln Brigade and the Civil Rights Congress came from New York and Philadelphia and interceded for the defendant; the Daily Worker representative was always present. The edition of the Daily Worker of February 1, 1952, attached to one of the petitions on file, quotes the defendant as thanking his friends and comrades, as well as the Abraham Lincoln Brigade and the Civil Rights Congress for their help in his trial. We make reference to this to show that this defendant was not the ignorant, youthful or otherwise incapacitated or neglected type of individual whose trial without counsel might be declared to be unfair and a deprivation of his rights contrary to the Fourteenth Amendment as intended for protection by cases as Gibbs v. Burke, 337 U.S. 773 (69 S. Ct. 1247) and Uveges v. Pa., 335 U.S. 437 (69 S. Ct. 184). As we view defendant's action, he purposely dispensed with counsel at his first trial as well as at his second for his own reasons which we do not deem it necessary to discuss. Since he did so understandingly and the court afforded him ample opportunity both before and during the trial to be represented, he may not now complain. A person has a *146 right to do without an attorney if he desires, U.S. v. Dennis, opinion by HAND, C.J., 183 F. 2d 201 (234).
Further, it may be said this entire matter was presented to the Pennsylvania Supreme Court in his petition for Writ of Prohibition and rejected when that court refused the Writ. This was at the very beginning of the trial.

VI. There were no prejudicial trial errors. 
It was not error to sustain the objection to the question eliciting the total amount of the earnings of Matthew Cvetic. The jury was fully informed that he had received compensation which he shared with others for an article he had supplied to a magazine and for moving picture rights. This was sufficient to attack his credibility without a disclosure of amounts of money actually received.
As to the witness, Dr. Apteker,  after he made a general statement that he knew of no communist who had ever been convicted for advocating the use of force to overthrow government, he was asked if he knew about those who had been convicted in New York in the case of Dennis v. United States. He replied that he did, but that they had not been convicted of advocating the overthrow of government by force but for conspiracy. The prominence of the New York trial was so extensive that it must be presumed the jury had already known of it so that the mention of it would not be prejudicial to defendant. However, the explanation given by the defendant was such as to support rather than adversely affect his credibility, and was therefore not prejudicial.
As to the charge of the Court,  there was no need for the jury to make an election of various acts in support of the indictment. As we have already pointed out, the indictment is sustainable on the basis of a continuing *147 crime. The indictment charged him with commission of the offenses on, before and after a specified date, originally July 19, 1950, and by amendment, August 31, 1950. In the citation to which defendant refers us in 23 C.J.S. 432, Criminal Law, Sec. 1044, this is recognized: "The principle of election is applicable, however, only where there is evidence of separate and distinct transactions; otherwise an election will not be required." State v. Laundy, 103 Ore. 443, 204 P. 958, relied on by defendant, also recognized the situation of several transactions constituting the same offense.
The charge did inadvertently state the period of the indictment to extend from August 31, 1948 to August 31, 1950, instead of October 17, 1948 to October 17, 1950, thereby including evidence from August 31, 1948 to October 17, 1948 and excluding the period from August 31, 1950 to October 17, 1950. However, since there is ample evidence to describe defendant's actions, intentions, associations, etc., from October 17, 1948 to August 31, 1950, to sustain the indictment, this error would not justify a new trial.
There is no merit in defendant's argument that because Clause (e) of the Act may have been read to the jury that the jury was permitted to find defendant guilty on a charge not preferred. A reading of the charge shows clearly that this issue was not submitted and that the charges were limited to the other sections of the Statute.
The charge concerning the credibility of defense witness Ben Carrothers was not erroneous. This witness was a convicted and sentenced perjurer as well as an associate of the defendant in the Communist movement. His testimony was, because of his conviction, not admissible under Sect. 322 of Act 1939, June 24, P.L. 872, 18 P.S. 4322. However, his record was not presented *148 until after he had testified at length (R. 2258 to 2375) and his testimony was permitted to remain under instruction explaining the interest of the witness and the general purpose of admitting evidence of prior convictions for felonies and misdemeanors crimen falsi,  the jury was then told it should give particular attention to the fact that it was the testimony of one convicted of perjury which ordinarily precluded the witness from giving any testimony. However, the jury had the benefit of the testimony and was given the election of accepting it or rejecting it and in this respect it was a benefit to defendant, rather than exclude it entirely. Defendant argues that had the testimony been rejected he could have offered another witness. This appears to be a weak argument in view of the facts. Defendant knew of the past record of the witness and stated he thought the disqualification was only for ten years (R. 2376), nevertheless, he offered him as his witness and accomplished the most he could hope for. He was, therefore, not surprised by the action of the Court and could have offered another witness had he so desired but he did not do so. Our reading of II Wigmore 617, Sec. 524, cited by defendant does not show us the instruction was erroneous.
Complaint is also made of heated and inflammatory remarks being made by witnesses and the district attorney. An examination of the record indicates that many times they were due to provocation by defendant. It also shows that the Trial Judge admonished both sides and their witnesses without distinction and that the jury was instructed to eliminate such remarks and altercations from their consideration of the case. The fact that they deliberated for twenty-one hours is some proof that the alleged inflammatory remarks had no effect.
*149 Defendant's motion to examine the record of the Grand Jury was refused on authority of Commonwealth v. Judge Smart, 368 Pa. 630: "That an indictment, regularly found and returned to the court, should be impeached by the testimony of the grand jurors who found the bill is a proposition that cannot be sustained."
The defendant's motion for a change of venue was refused by the Trial Judge in the first trial and his action was sustained on appeal. In the present case, the same motion was presented (being in fact a duplicate copy of the motion presented at the first trial) and refused because of the previous action of our Appellate Court and for the further reason that there were no additional reasons or sufficient importance to support it. The effort of defendant to secure counsel has been discussed, the publicity was no more unfavorable or extensive, the public feeling had subsided as it generally does in the re-trial of any matter, and the role of M.A. Musmanno (acting as an individual) was the same. Nor can we justify a change of venue because additional charges may be preferred against an accused, whether in the same or any other court. In our opinion, there is nothing to indicate that the public of Allegheny County considered the defendant or the subject matter of the case more important or were more concerned or acquainted with him or it than the public in any other county of the Commonwealth. In fact, there was the great possibility that the general public of Allegheny County may have been less acquainted or less concerned because of the size of the county and its population than that of a smaller county to which the case might have been sent. Every effort was made by the Trial Judge to handle it as any other case that arose and required trial, without emphasis or particular notice.
*150 Lastly, the alleged prejudice and bias of the Trial Judge is given as a reason for defendant's motion. This is due to his membership in an organization called, "Americans Battling Communism", chartered by the Courts of this County November 22, 1947, with the purpose set forth below: "This association, to be duly incorporated under the laws of the Commonwealth of Pennsylvania as a non-profit corporation, is established for the purpose of combining the efforts of recognized American organizations and societies dedicated to the preservation of constitutional government in the United States and to block the inroads made by the communist agencies; and to formulate and execute a more definite and aggressive program for enlightening the American people as to the purpose, the methods and the agencies of the communist organization to the end that an enlightened and alerted public opinion shall take steps, including the adoption of security legislation, as may be necessary to eliminate the threat posed by communism to the American way of life."
At the time of trial, the Trial Judge was inactive and his interest was merely as a supporting but non-attending member. At the inception, he had been an officer and later a director. However, he was without knowledge that any money had been given to the witness Matthew Cvetic or that any other member had any financial arrangements with said witness or that any member of the organization had participated in the arrest of defendant or in the preparations for his trial. Before undertaking the trial, he discussed the situation with two of his colleagues, Judges JOHN J. KENNEDY and RUSSELL H. ADAMS, both assigned to the Criminal Court Branch at the time, and being satisfied in his own mind that regardless of his feeling toward Communism, he was not biased or prejudiced against the defendant, he presided. He was satisfied that he *151 was in the same position and had the same mental outlook as expressed by Chief Justice DREW in Schlesinger Petition, 367 Pa. 476 (81 A. 2d 316): "It need hardly be stated that this Court is as opposed to communism in all its manifestations as the respondent Judge. . . . But it is our sacred duty to uphold the Constitutions and laws of our Country and State and their provisions as to due process of law." To the Trial Judge, his membership in Americans Battling Communism was similar to a veteran's membership in any of the veteran organizations opposing totalitarism, or as a churchman's membership in his church opposing atheism.
We are therefore of the unanimous opinion that the defendant had a fair trial and that he has been duly convicted on all of the counts of the indictment, in accordance with constitutional requirements.
The motions for a new trial and arrest of judgment will both be refused and the verdict of the jury sustained.
PER CURIAM.
Defendant was found guilty of sedition (Act of June 24, 1939, P.L. 872, § 207, 18 PS § 4207). He has appealed from the judgment of sentence.
We are of the opinion that the case was fairly tried by Judge MONTGOMERY. We find no reversible error. The judgment is affirmed on the opinion of Judge MONTGOMERY.
Judgment affirmed.
NOTES
[1] The Smith Act of June 25, 1948, C 645, 62 Stat. 808, 18 U.S.C.A. 2384-2385, being a restatement with amendment of the Act of June 28, 1940, C 439 (18 U.S.C. 1950-Ed.) (10, 11, 13) and the Act of March 4, 1909, Sect. 6 (18 U.S.C. 1940-Ed.) (6) and the McCarran or Internal Security Act of Sept. 23, 1950, C 1024, Title I (50 U.S.C.A. 781) (et seq.)
[2] The powers not delegated to the U.S. by the Constitution nor prohibited by it to the states, are reserved to the states respectively, or to the people.
[3] "Tit. 50, U.S.C.A. 812. Declaration of `internal security emergency' by President; events warranting; period of existence (a) In the event of any one of the following: (1) Invasion of the territory of the United States or its possessions, (2) Declaration of war by Congress, or (3) Insurrection within the United States in aid of a foreign enemy, and if, upon the occurrence of one or more of the above, the President shall find that the proclamation of an emergency pursuant to this section is essential to the preservation, protection and defense of the Constitution, and to the common defense and safety of the territory and people of the United States, the President is authorized to make public proclamation of the existence of an `Internal Security Emergency'. (b) A state of `Internal Security Emergency' (hereinafter referred to as the `emergency') so declared shall continue in existence until terminated by proclamation of the President or by concurrent resolution of the Congress. Sept. 23, 1950, c. 1024, Title II, § 102, 64 Stat. 1021."
[4] See cases cited in Milasinovich v. The Serbian Progressive Club, Inc., 369 Pa. 26 (p. 29).