**UNITED STATES v. MESAROSH et al.**
Cr. No. 13531.

United States District Court,
W. D. Pennsylvania.

Nov. 10, 1953.

See, also, 115 F.Supp. 332.

Edward C. Boyle, U. S. Atty., Irwin A. Swiss, Asst. U. S. Atty., Pittsburgh, Pa., William G. Hundley and Richard J. Alfriend III Sp. Pros. Counsel, Norfolk, Va., of counsel, for Government.

Hymen Schlesinger, Pittsburgh, Pa., for all defendants.

Ralph E. Powe, Brooklyn, N. Y., for defendants Dolsen and Albertson.

Reuben Terris, New York City, for defendants Nelson, Careathers and Weissman.

MARSH, District Judge.

In this criminal action the defendants are charged with conspiring[1] to teach and advocate the overthrow of the Government of the United States by force and violence as speedily as circumstances will permit in violation of the Smith Act.[2]

The grand jury returned a true bill on January 18, 1952. On May 27, 1952, the defendants were arraigned before our late esteemed colleague, the Honorable William Alvah Stewart, and entered pleas of not guilty. Subsequently, voluminous and numerous motions were filed. The many hearings held culminated in an opinion and order of Judge Stewart filed October 10, 1952, denying all pretrial motions; 13 F.R.D. 180.

On November 12, 1952, Judge Stewart drew a jury panel of 51 names and commenced the voir dire examination. This continued for seven court days, during which time only twenty jurors were interrogated.[3]

On December 16, 1952, because of the serious illness of Judge Stewart, an order was entered assigning the case to this court for trial and disposition. February 2, 1953, was fixed as the date of trial.

Because the defendant Albertson underwent a surgical operation, the trial was continued to February 16, 1953, and finally until February 24, 1953. All motions which had theretofore been made before Judge Stewart were renewed before this court for the purpose of pro-

---

1. 18 U.S.C.A. § 371.

2. 18 U.S.C.A. § 2385.

3. Judge Stewart asked the entire panel several general questions in an attempt to expedite the voir dire.

tecting the record. We considered these motions on their merits and denied them on March 2, 1953. Additional hearings were held challenging the jury panel.

The court determined upon the manner in which the jury should be selected, and twelve jurors and four alternates were accordingly chosen which, in our opinion, could fairly and impartially determine the guilt or innocence of the defendants.

The prosecution presented its case and rested on April 16, 1953. The defendants requested a recess so that they might have an opportunity to prepare motions for judgment of acquittal, motions to strike certain testimony, renewed motions on double jeopardy, and a renewed motion for mistrial because of the political climate. The court granted a recess during which time Bertram Edises, Esquire, counsel for the defendants Nelson, Careathers and Weissman, became ill. Additional continuances were granted to permit Mr. Edises an opportunity to recuperate. On May 18, 1953, the defendants opened to the jury. Mr. Edises continued to represent his clients, and one of them, the defendant Weissman, took the stand and testified on behalf of the defendants. The cross-examination of Weissman was substantially completed when the court permitted Mr. Edises to withdraw from the case because of his illness and the defendants were granted a continuance to June 1, 1953, on their representation that they would be prepared to continue the trial "in any event" by that date.[4]

Various motions were subsequently made and continuances were granted until June 16, 1953. Reuben Terris, Esquire, after appearing specially to request a mistrial, entered his appearance as trial counsel for the defendants previously represented by Mr. Edises. He requested a continuance to October 1, 1953, which was refused and a continuance was granted to July 16, 1953. On July 14, 1953, Mr. Terris requested a continuance until July 20, 1953, to permit argument and consideration of a motion for mistrial filed July 9, 1953, and to grant additional time for Mr. Nelson to recuperate from a goiter operation he had had performed in New York.[5] On July 16, 1953, Royal W. France, Esquire, was admitted specially to argue the motion for mistrial based on publicity which accompanied a hearing before the Senate Permanent Subcommittee on Internal Security in Washington, D. C., at which Joseph Mazzei, a witness for the prosecution in this case, had testified. That motion was denied as well as other motions for mistrial and for continuance.

On July 20, 1953, the trial was finally resumed and on August 12, 1953, the defendants rested. Summations in behalf of defendants were made by Messrs. Terris and Powe, of counsel, and by two defendants, Nelson and Careathers. On August 18, 1953, after the court's charge, the jury entered upon its deliberation and on August 20, the jury returned a verdict of guilty as to all five defendants.

Arguments on various motions were heard, including arguments for a new trial. The court denied the motions and on August 25 sentenced each defendant to five years in the federal penitentiary.

The motion for a new trial raised several matters which had been decided many, many times by this court and in some instances by Judge Stewart in his phase of the proceedings. The legal merit of other points raised in the motion is obscure, for example, No. 14, where the defendants state: "The Court erred in admitting testimony of each and

---

4. The representation made was that defendants would either secure new counsel, proceed with counsel already in the case, or *pro se*. See Transcript, pages 3423, 3935 and 3937.

5. This operation was not shown to be of an emergency nature. Mr. Nelson did not secure the court's permission to have the operation performed nor was the court apprised of the operation until the motion for continuance was made. A medical examination was ordered and an opinion indicated that Nelson had recovered sufficiently to stand trial.

every prosecution and defense witness to which objections were made." It would appear from this point that the defendants incorporate in their reasons for a new trial the fact that the court overruled objections of the Government to questions asked of defense witnesses. No. 13 is subject to the same criticism.

We, therefore, will limit our remarks to four matters which we believe merit discussion. They are as follows:

1. The method used by this court in selecting a jury.

2. The court's refusal of defendants' requests for the production of F.B.I. reports.

3. Denial by this court of a motion for mistrial because of the illness and withdrawal of defense counsel.

4. The interrogation by this court of the jury as to whether or not they had read the newspaper account of Joseph Mazzei's testimony before the Senate Permanent Subcommittee on Internal Security.

### I
### Selection of Jury.

On November 12, 1952, Judge Stewart launched upon an extensive *voir dire* examination in which each juror was individually examined out of the presence of the other jurors. This examination continued through November 19, 1952. In this interim twenty jurors were examined. About 500 pages of transcript were taken.

After twenty jurors had been extensively interrogated, thirteen were excused for various reasons.[6] Some of the excused jurors had expressed normal and common prejudices against communism, and those who did not the defendants challenged for cause, assuming that they were either coached or uninformed. Mr. Swiss, Assistant United States Attorney, at this point injected a cogent remark. He stated at page 295 of the transcript that "If a prospective Juror says that he has an opinion, then, of course, he is disqualified; if a prospective Juror says that he has formed no opinion, then, according to Mr. Edises [of defense counsel], the Juror shows a certain suspicious naivete, which implies a coaching * * *."

It seemed to this court, after carefully reviewing the procedure followed by Judge Stewart, that to obtain a juror who would make the "right" answers (from defendants' point of view) to the questions propounded, he or she would have to be a person who had lived in a vacuum, or was an imbecile, or a communist. The probing of the minds of the jurors as suggested by defense counsel would have required months of interrogation with comprehensive discourses on the various theories of communism, socialism and capitalism. At the end of interrogation of this sort, in our opinion, we would have been in no better position to select a qualified jury than we were after the *voir dire* which we conducted.

■ Reaping the benefit of Judge Stewart's *voir dire* experience, general questions were formulated which could be propounded to the entire jury panel. Consequently, jurors were quickly excused because of health or hardship, and because they or their families were Government employees or pensioners, etc. Those remaining were asked if they had read certain articles, or read articles by certain authors, or belonged to certain organizations.

We then empaneled 43 jurors and asked them specific questions concerning their occupation, opinions, etc. As challenges for cause were sustained, we dismissed the juror and replaced him with one of the jurors who had remained in the courtroom during the *voir dire*. The replacement was then asked concerning the previous questions and the *voir dire* continued. The vital specific questions were put to each empaneled juror. When all of the questions had been

---

6. It is apposite to note that several were challenged because their answers to questions which presupposed legal training were objectionable to the defendants.

asked by the court, peremptory challenges [7] were exercised and a jury of twelve remained. Eight jurors were then called and questioned in the same manner. After peremptory challenges of two by defendants and two by the Government, four alternate jurors remained.

■ It is the opinion of the court that a jury was selected which was able to try the defendants with fairness and impartiality. If we had permitted counsel to conduct the *voir dire* or to participate in the questioning, it is our judgment that the *voir dire* would have resolved itself into trap questions, lengthy explorations of the deeper recesses of the jurors' minds, and psychological arguments. Accordingly, the *voir dire* was conducted by the court pursuant to Rule 24(a), Fed.Rules Crim.Proc., 18 U.S.C.A.[8] The questions propounded were gleaned from suggestions furnished by the defendants and the prosecution, with some modification by the court. Several jurors admitted they were biased or prejudiced and were excused; the remaining prospects stated they could give defendants a fair trial. We believe all the empaneled jurors truthfully answered the searching inquiries put to them.

In determining the manner of conducting the *voir dire*, the remarks of Judge Learned Hand were of decisive influence. In United States v. Dennis, 2 Cir., 1950, 183 F.2d 201 at page 227, he stated: "If trial by jury is not to break down by its own weight, it is not feasible to probe more than the upper levels of a juror's mind. * * * The defendants' questions, which the Rule gave them the privilege of submitting, were more specific and might have evoked answers that disclosed sentiments that on further probing might in turn have evoked prejudice which ought to have

disqualified the juror; but by themselves they would not have done so. In other words they were useful only as preliminaries to a further detailed examination; and that might have unduly extended the *voir dire*, which, as it was, occupied eight court days."

■ If the court had not been satisfied that each juror could and would fairly and impartially perform his duty, we would have continued the *voir dire*. Once we were satisfied of that fact, however, the purpose of the *voir dire* was ended.

## II
### Production of F.B.I. Reports.

In the course of the testimony of Matt Cvetic, a Government witness, the defendants requested that the Government be required to produce the F.B.I. reports made by the witness. See transcript, pages 1172 and 1643. Request denied at transcript, page 1695. The reasons suggested for the request were:

1. That Cvetic's recollection was fresher when he made the reports and, therefore, would aid in securing an accurate account of the events recorded therein;

2. That, with the aid of the reports, defendants would be in a better position to test Cvetic's memory and recollection.

The request was confined to reports which dealt with the events about which Cvetic had testified.

The Government objected to the request to produce F.B.I. reports because:

1. The reports are confidential and privileged under an order issued pursuant to 5 U.S.C.A. § 22 which appears in 18 F.R. § 1368;

2. Cvetic did not use the reports to refresh his recollection;

3. Defendants did not show that the reports contained contradictory matter;

---

7. The defendants were given 3 peremptory challenges each and 10 jointly, or a total of 25. The Government had 6 peremptory challenges.

8. Rule 24(a) states that "The court may

permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. * * *"

4. The request was nothing more than a fishing expedition.

■ At the trial[9] Mr. Edises, in support of his request, stated "We should have the best evidence." It was upon this argument that defendants relied. When it was shown that the witness had not used the reports to refresh his recollection, we were of the opinion that the defendants could not demand that they be produced. See Vol. 3, Wigmore on Evidence, page 111, footnote 4; Goldman v. United States, 1942, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322. The defendants' contention that the reports were the best evidence is without merit. The remaining issue is whether defendants could secure the reports to contradict the witness.

■ The cases indicate that the claim of privilege in a criminal case is lost by the Government when it puts a witness on the stand. See United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503, 506; United States v. Beekman, 2 Cir., 1946, 155 F.2d 580, 584; United States v. Krulewitch, 2 Cir., 1944, 145 F.2d 76, 79, 156 A.L.R. 337; and see the dicta in United States v. Reynolds, 1952, 345 U.S. 1, 2, 73 S.Ct. 528. We believe that the claim of privilege was lost in this case when Cvetic began to testify.

■ We are of the further opinion that the Government's contention that defendants are not entitled to the reports because they have not shown that the reports contradict Cvetic is untenable. Defendants cannot show that the reports contradict the witness unless they see them.

■ It appears to the court, however, that defendants did not lay the proper foundation to require the court to grant the request. In the case of United States v. Schneiderman, D.C.S.D.Cal. 1952, 106 F.Supp. 731, which case was not called to our attention at this stage of the trial, Judge Mathes compelled the Government to produce the three reports requested by defendants. The reports were first examined by the court and then given to the defendants. Counsel suggested this procedure without alluding to the Schneiderman case.[10] The difference between the Schneiderman case and the case sub judice is that the defendants in this case did not ask for specific reports but for all the reports "which deal with matters concerning which the witness testified to here."

Likewise, in Gordon v. United States, 1953, 344 U.S. 414, 418, 73 S.Ct. 369, 373, wherein the Supreme Court reversed the trial court for failure to require the production of documents, it was said:

"By proper cross-examination, defense counsel laid a foundation for his demand by showing that the documents were in existence, were in possession of the Government, were made by the Government's witness under examination, were contradictory of his present testimony, and that the contradiction was as to relevant, important and material matters which directly bore on the main issue being tried: the participation of the accused in the crime. *The demand was for production of these specific documents and did not propose any broad or blind fishing expedition among documents possessed by the Government on the chance that something impeaching might turn up.*" (Emphasis added.)

Cvetic's testimony covered a period of about nine years—his entire period of employment by the F.B.I. He testified that he not only reported in writing but also reported in person and by telephone. It appears to the court that the request was tantamount to a request for a *carte blanche* to see the F.B.I. reports. For the court to have read all these reports and determined what the defendants should see and what they should not see may have been a monumental undertaking.

9. Transcript, page 1172.

10. Transcript, page 1645.

Since there was no attempt to lay a proper foundation by specifying the particular reports which were desired, we believed the request for production of F.B.I. reports was properly denied.

### III
### Denial of Mistrial Because of Illness and Withdrawal of Defense Counsel.

As has been stated, Mr. Edises was granted leave to withdraw from the case on May 27, 1953, because of illness. Leave to withdraw was in part granted in reliance upon representations that defendants would proceed with the trial.

On June 12, 1953, Reuben Terris, Esquire, of New York, appeared specially on behalf of the defendants formerly represented by Mr. Edises and orally moved for a mistrial. He argued that it was impossible for substitute counsel to represent the defendants properly through the remainder of the trial because, regardless of preparation and study, a substitute could not hope to know the demeanor and manner of the Government witnesses and the defendant Weissman; nor could substitute counsel hope to know the reaction of the jury toward these witnesses; and, therefore, it would be impossible for substitute counsel to effectively present an argument to the jury on the important phase of credibility.[11] He also stated that he had never heard of a criminal case which had not been continued upon withdrawal of counsel for defense because of illness. He admitted a paucity of authority on the proposition but submitted a number of civil cases to support his view.

It appears to the court that in Mr. Terris' earnest argument for a mistrial, he failed to take into consideration several important matters in connection with this particular trial. The trial had already been subject to many and varied delays. The delays were not always at the request of defendants but it became apparent early in the proceedings that every opportunity for delay would be seized upon by defendants. In the three months following the beginning of the trial on February 24, only about thirty days had been spent in the courtroom.

On May 7, 1953, it became evident to the court that Mr. Edises was ill and that he might not be able to continue with the trial. Anticipating the subsequent withdrawal of Mr. Edises, the court ordered Hymen Schlesinger, Esquire, of Pittsburgh, Pennsylvania, counsel of record for all the defendants,[12] to attend the trial and prepare to take over the defense if Mr. Edises withdrew. This order was vacated when Mr. Schlesinger vehemently opposed it and when Mr. Albertson on behalf of all the defendants assured the court that they earnestly desired to proceed with the trial and that they would immediately take steps to procure other counsel, or consider proceeding *pro se* or with Ralph E. Powe, Esquire, as their counsel. Mr. Powe had represented the defendants Dolsen and Albertson throughout the trial and had worked closely with Mr. Edises on the joint defense of the five defendants.

On May 27, 1953, Mr. Powe, acting for the defendants, notified the court of the actual withdrawal of Mr. Edises. He requested a continuance to June 1, 1953, on the representation that defendants were trying to secure substitute counsel but would proceed on that date in any event.[13] The continuance was granted but on May 29 the defendants advised the court that they could not obtain substitute counsel; that they had changed their minds and would not proceed with Mr. Powe, Mr. Schlesinger or *pro se*. It became very evident to the court that the defendants were playing a

---

11. We might say that Mr. Terris' summation to the jury did as much as any speech could have done in attacking the credibility of witnesses.

12. Attorneys who do not maintain an office in this district shall have associate counsel residing in and maintaining an office in the district, whose appearance shall be entered of record. See Rules of Court, Rule 1(e), U.S.D.C. Western District of Pennsylvania.

13. See footnote 4 on page 3.

game for delay, to say nothing of the obligation due the court when counsel makes representations to it, or the affront to the court when such representations are relied on by the court and then suddenly changed.

On June 3, 1953, the defendants categorically stated to the court that they did not want their chosen counsel of record—Mr. Schlesinger—to represent them as trial counsel. Thereupon the court cleared the way for the defendants to proceed *in forma pauperis* and offered to select and appoint competent legal counsel from the members of the bar in the Western District of Pennsylvania to represent the defendants for the balance of the trial. This offer was categorically and promptly refused. The court had already fixed June 16 as a deadline for the resumption of the trial—a period of forty days from the time the court alerted defendants to arrange for substitute counsel and nineteen days after the actual withdrawal of Mr. Edises.

On June 12 the defendant Albertson telephoned chambers and requested permission to introduce "their counsel" to the court. This permission was granted. Mr. Terris was introduced to the court, and, as stated, entered his special appearance and moved for mistrial. In these circumstances we were constrained to deny the motion.

The jury reconvened on June 16 as scheduled. Mr. Terris asked leave to enter his appearance generally and requested a continuance to October 1, 1953, to prepare for trial. The court refused to recess until October 1, but advised Mr. Terris he would be given one month to prepare for trial.[14] This was accepted under protest and Mr. Terris was admitted specially as trial counsel.

We are firmly convinced that the defendants would have been more than adequately and effectively represented and their rights fully protected had they agreed to permit their selected counsel of record—Mr. Schlesinger—or Mr. Powe, or both, to finish the trial for them.[15] We are also firmly convinced that events justified our decision to deny the motion for mistrial. Mr. Terris capably represented his clients and received the utmost cooperation and active assistance from Mr. Powe who, in effect, acted as co-counsel.

We were further fortified in our decision to deny the motion for mistrial by the fact that the defendants Nelson and Careathers were permitted to open and close to the jury. This was agreed to by Judge Stewart and by this court on the representation that no attorney could present the true aims and objectives of the Communist Party and the defendants to the jury.[16]

At the time Mr. Edises was permitted to withdraw, the court was advised that only two witnesses remained to be called by defendants and that the Government had only a few questions to conclude the cross-examination of the witness Weissman. The two remaining witnesses were the defendant Albertson, who was represented by Mr. Powe, and a Benjamin J. Davis, who was brought to this district from the penitentiary in Terre Haute, Indiana, by way of habeas corpus proceedings initiated by the defendant Dolsen, also represented by Mr. Powe. With the exception of two witnesses from the Carnegie Library of Pittsburgh, whose testimony was of a routine nature and consumed less than an hour, Albertson and Davis were the last witnesses to testify on behalf of the defendants. Mr. Powe conducted the major portion of their interrogation.

14. This is about the same amount of time Judge Stewart gave Mr. Edises to prepare at the beginning of the trial. See record before Judge Stewart, October 14, 1952, page 31.

15. It is apposite to note that Mr. Schlesinger has been present and in many instances represented the defendants in the post-trial proceedings in this court.

16. See record before Judge Stewart, October 14, 1952, pages 8–12.

In the circumstances, we believe that the withdrawal of Mr. Edises did not, *ipso facto*, compel the granting of a mistrial. We are of the opinion that the matter was one of discretion. In exercising our discretion we considered the complications in this case; the difficult and time-consuming task of getting the trial under way; the time, expense and difficulty in selecting a jury; the time already consumed in trial; the representation that Nelson and Careathers were not going to take the witness stand; the refusal of these defendants and the defendant Weissman to proceed with their counsel of record, or with Mr. Powe; their refusal to permit the court to appoint counsel; the intelligence and ability of defendants to inform new counsel of their desires, strategy and theories of defense [17]; the fact that Mr. Powe continued to act in a manner which indicated that he was protecting the interests of not only his clients but those represented by Mr. Edises as well; and the fact that the defendants Nelson and Careathers were permitted to open and close to the jury. After considering these factors, we were of the opinion that our discretion should be exercised in favor of continuing the trial.

Mr. Terris' participation in the trial indicated that we had not abused our discretion. He fully protected the rights of his clients and the fact that the defendants were convicted does not reflect on his conduct of the trial.

## IV

### Interrogation of the Jury by the Court.

The final matter on which we think reasons should be set forth concerns a motion for mistrial which was based on the alleged prejudice created by a newspaper article and the publicity attendant on a hearing conducted by the Senate Permanent Subcommittee on Internal Security headed by Senator Joseph R. McCarthy. This motion was filed on July 9, 1953. It concerned the publicity given to the testimony of one Joseph D. Mazzei, who testified before the Committee on June 18, 1953. Mr. Mazzei testified for the prosecution in this case.

The defendants urged that under the decision of Delaney v. United States, 1 Cir., 1952, 199 F.2d 107, we were compelled to declare a mistrial. Defendants brought Royal W. France, Esquire, before this court to appear specially and argue the motion. The legal argument centered around the factual issue of whether the jury had read or heard about the incident. Defendants urgently argued that the court was required to presume prejudice. We, however, are of the opinion that presumptions need not be indulged in if the facts are available.

We, therefore, interrogated each juror under oath and out of the presence of the others. In this manner it became abundantly clear that, with only two exceptions, the jurors had not read the article or heard anything about the matter raised by the defendants. The two who had any knowledge of the incident only heard the name Mazzei mentioned on the radio or saw his picture in the paper but could not remember what the incident was about.

From this examination it was clear that the publicity concerning Mr. Mazzei had not prejudiced the defendants, and in denying the motion, we found this to be the fact. Our interrogation refrained from disclosing the nature of the pub-

---

17. Messrs. Nelson, Careathers and Weissman are highly intelligent; they were familiar with courtroom strategy, the Constitution of the United States, and the complications of a Smith Act trial. See addresses to jury by Nelson and Careathers, and the testimony of Weissman. By insisting that Albertson, or one of them, attend all side-bar discussions between counsel and the court, the inference arises that they actively participated in the procedure and legal development of the trial.

licity,[18] and we told the members of the jury not to inquire into it.

 The defendants' counsel both vigorously objected to the interrogation. They also urged even after the interrogation that the court had to presume prejudice. We think this argument is wholly unsound.

In the Delaney case the court presumed prejudice because there was no evidence to the contrary. In this case the evidence clearly shows that the jury was not aware of the alleged prejudicial matter. The interrogation further indicated that the jury was so assiduous in complying with our admonishment not to read about this case during the trial that they did not read or listen to matters related to the trial because of the identity of names.

If the interrogation had revealed any knowledge of the alleged incident and any resultant prejudice, we would have granted the motion. When such was not the case, the motion was denied.

We have attempted herein to set forth some of the factors which guided the court in deciding the issues. This is not intended as an all-inclusive opinion. Many of the matters raised during these proceedings were decided by Judge Stewart. His opinion in 1952, 13 F.R.D. 180, greatly reduced the burden on this court and we have adopted his rulings and reasoning as set forth therein. Many of the matters raised at trial were disposed of by written orders to which we attached memoranda setting forth our reasons.

Since the defendants have filed notice of appeals, we undertook to discuss the matters herein, not only because we think the parties are entitled to our reasons, but also because they may be of some benefit to the judges who will review the proceedings.

18. Although defense counsel requested that we ask the jurors if they had read in this article or heard about a plot to assassinate Senator McCarthy, we refused so to do because it would have brought to the jury's attention facts and implications which we thought should remain unconnected with the case.