## PENNSYLVANIA *v.* NELSON.

No. 10. Argued November 15–16, 1955.—Decided April 2, 1956.

*Frank F. Truscott,* Special Deputy Attorney General of Pennsylvania, and *Harry F. Stambaugh* argued the cause for petitioner. With them on the brief were *Frank P. Lawley, Jr.,* Deputy Attorney General, and *Albert A. Fiok.*

*Herbert S. Thatcher* argued the cause for respondent. With him on the brief was *Victor Rabinowitz.*

By special leave of Court, *Charles F. Barber* argued the cause for the United States, and *Louis C. Wyman,* Attorney General, for the State of New Hampshire, as *amici curiae,* urging reversal. On the brief with *Mr. Barber* were *Solicitor General Sobeloff, Assistant Attorney General Tompkins, Harold D. Koffsky* and *Philip R. Monahan. Mr. Wyman* also filed a brief.

Briefs of *amici curiae* urging reversal were filed by *George Fingold,* Attorney General, and *Lowell S. Nicholson, Samuel H. Cohen* and *Fred L. True, Jr.,* Assistant Attorneys General, for the State of Massachusetts, and *Ralph B. Gregg* for the American Legion.

Briefs of *amici curiae* urging affirmance were filed by *Osmond K. Fraenkel* and *Herbert Monte Levy* for the American Civil Liberties Union, *Walter C. Longstreth, Allen S. Olmsted, 2d* and *William Allen Rahill* for the Civil Liberties Committee of the Philadelphia Yearly Meeting of the Religious Society of Friends, and *Frank J. Donner, Royal W. France, Arthur Kinoy* and *Marshall Perlin* for Feldman et al.

Mr. Chief Justice Warren delivered the opinion of the Court.

The respondent Steve Nelson, an acknowledged member of the Communist Party, was convicted in the Court of Quarter Sessions of Allegheny County, Pennsylvania, of a violation of the Pennsylvania Sedition Act [1] and sentenced to imprisonment for twenty years and to a fine of $10,000 and to costs of prosecution in the sum of $13,000. The Superior Court affirmed the conviction. 172 Pa. Super. 125, 92 A. 2d 431. The Supreme Court of Pennsylvania, recognizing but not reaching many alleged serious trial errors and conduct of the trial court infringing upon respondent's right to due process of law,[2] decided

---

[1] Pa. Penal Code § 207, 18 Purdon's Pa. Stat. Ann. § 4207. The text of the statute is set out in an Appendix to this opinion, *post,* p. 510.

[2] The Supreme Court also did not have to reach the question of the constitutionality of subdivision (c) of the Pennsylvania Act, the basis of four counts of the twelve-count indictment, which punishes utterances "or conduct [intended to] incite or encourage any person to commit any overt act with a view to bringing the Government of this State or of the United States into hatred or contempt." Cf. *Winters* v. *New York,* 333 U. S. 507. This provision is strangely

the case on the narrow issue of supersession of the state law by the Federal Smith Act.[3] In its opinion, the court stated:

> "And, while the Pennsylvania statute proscribes sedition against either the Government of the United States or the Government of Pennsylvania, it is only alleged sedition against the United States with which the instant case is concerned. Out of all the voluminous testimony, we have not found, nor has anyone pointed to, a single word indicating a seditious act or even utterance directed against the Government of Pennsylvania." [4]

The precise holding of the court, and all that is before us for review, is that the Smith Act of 1940,[5] as amended in 1948,[6] which prohibits the knowing advocacy of the overthrow of the Government of the United States by force and violence, supersedes the enforceability of the Pennsylvania Sedition Act which proscribes the same conduct.

Many State Attorneys General and the Solicitor General of the United States appeared as *amici curiae* for petitioner, and several briefs were filed on behalf of the respondent. Because of the important question of federal-state relationship involved, we granted certiorari. 348 U. S. 814.

---

reminiscent of the Sedition Act of 1798, 1 Stat. 596, which punished utterances made "with intent to defame the . . . government, or either house of the . . . Congress, or the . . . President, or to bring them . . . into contempt or disrepute; or to excite against them . . . the hatred of the good people of the United States . . . ."

[3] 377 Pa. 58, 104 A. 2d 133.

[4] 377 Pa., at 69, 104 A. 2d, at 139.

[5] 54 Stat. 670.

[6] 18 U. S. C. § 2385. The text of the statute is set out in an Appendix to this opinion, *post,* p. 511. (Another part of the Smith Act, punishing the advocacy of mutiny, is now 18 U. S. C. § 2387.)

It should be said at the outset that the decision in this case does not affect the right of States to enforce their sedition laws at times when the Federal Government has not occupied the field and is not protecting the entire country from seditious conduct. The distinction between the two situations was clearly recognized by the court below.[7] Nor does it limit the jurisdiction of the States where the Constitution and Congress have specifically given them concurrent jurisdiction, as was done under the Eighteenth Amendment and the Volstead Act. *United States* v. *Lanza,* 260 U. S. 377. Neither does it limit the right of the State to protect itself at any time against sabotage or attempted violence of all kinds.[8] Nor does it prevent the State from prosecuting where the same act constitutes both a federal offense and a state offense under the police power, as was done in *Fox* v. *Ohio,* 5 How. 410, and *Gilbert* v. *Minnesota,* 254 U. S. 325, relied upon by petitioner as authority herein. In neither of those cases did the state statute impinge on

_____

[7] "No question of federal supersession of a state statute was in issue . . . when the Supreme Court upheld the validity of the state statutes in *Gitlow* v. *New York,* 268 U. S. 652 (1925), and *Whitney* v. *California,* 274 U. S. 357 (1927)." 377 Pa., at 73–74, 104 A. 2d, at 141.

Although the judgments of conviction in both *Gitlow* and *Whitney* were rendered in 1920, before repeal of the federal wartime sedition statute of 1918, 41 Stat. 1359, the question of supersession was not raised in either case and, of course, not considered in this Court's opinions.

[8] "Nor is a State stripped of its means of self-defense by the suspension of its sedition statute through the entry of the Federal Government upon the field. There are many valid laws on Pennsylvania's statute books adequate for coping effectively with actual or threatened internal civil disturbances. As to the nationwide threat to all citizens, imbedded in the type of conduct interdicted by a sedition act, we are—all of us—protected by the Smith Act and in a manner more efficient and more consistent with the service of our national welfare in all respects." 377 Pa., at 70, 104 A. 2d, at 139.

federal jurisdiction. In the *Fox* case, the federal offense was counterfeiting. The state offense was defrauding the person to whom the spurious money was passed. In the *Gilbert* case this Court, in upholding the enforcement of a state statute, proscribing conduct which would "interfere with or discourage the enlistment of men in the military or naval forces of the United States or of the State of Minnesota," treated it not as an act relating to "the raising of armies for the national defense, nor to rules and regulations for the government of those under arms [a constitutionally exclusive federal power]. It [was] simply a local police measure . . . ."[9]

Where, as in the instant case, Congress has not stated specifically whether a federal statute has occupied a field in which the States are otherwise free to legislate,[10] dif-

---

[9] 254 U. S., at 331. The Court went on to observe: ". . . the State knew the conditions which existed and could have a solicitude for the public peace, and this record justifies it. Gilbert's remarks were made in a public meeting. They were resented by his auditors. There were protesting interruptions, also accusations and threats against him, disorder and intimations of violence. And such is not an uncommon experience. On such occasions feeling usually runs high and is impetuous; there is a prompting to violence and when violence is once yielded to, before it can be quelled, tragedies may be enacted. To preclude such result or a danger of it is a proper exercise of the power of the State." *Id.*, at 331–332.

[10] Petitioner makes the subsidiary argument that 18 U. S. C. § 3231 shows a congressional intention not to supersede state criminal statutes by any provision of Title 18. Section 3231 provides:

"The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

"Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

The office of the second sentence is merely to limit the effect of the jurisdictional grant of the first sentence. There was no intention to resolve particular supersession questions by the Section.

ferent criteria have furnished touchstones for decision. Thus,

> "[t]his Court, in considering the validity of state laws in the light of . . . federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula." *Hines* v. *Davidowitz,* 312 U. S. 52, 67.

And see *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230–231. In this case, we think that each of several tests of supersession is met.

*First,* "[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S., at 230. The Congress determined in 1940 that it was necessary for it to re-enter the field of antisubversive legislation, which had been abandoned by it in 1921. In that year, it enacted the Smith Act which proscribes advocacy of the overthrow of any government—federal, state or local—by force and violence and organization of and knowing membership in a group which so advocates.[11] Conspiracy to commit any of these acts is punishable under the general criminal conspiracy provisions in 18 U. S. C. § 371. The Internal Security Act of 1950 is aimed more directly at Communist organizations.[12] It distinguishes between "Communist-

---

[11] See Appendix, *post,* p. 511. See also the Voorhis Act passed in 1940, now codified as 18 U. S. C. § 2386, and the Foreign Agents Registration Act passed in 1938, 22 U. S. C. § 611 *et seq.*

[12] 50 U. S. C. § 781 *et seq.*

action organizations" and "Communist-front organizations,"[13] requiring such organizations to register and to file annual reports with the Attorney General giving complete details as to their officers and funds.[14] Members of Communist-action organizations who have not been registered by their organization must register as individuals.[15] Failure to register in accordance with the requirements of Sections 786–787 is punishable by a fine of not more than $10,000 for an offending organization and by a fine of not more than $10,000 or imprisonment for not more than five years or both for an individual offender—each day of failure to register constituting a separate offense.[16] And the Act imposes certain sanctions upon both "action" and "front" organizations and their members.[17] The Communist Control Act of 1954 declares "that the Communist Party of the United States, although purportedly a political party, is in fact an instrumentality of a conspiracy to overthrow the Government of the United States" and that "its role as the agency of a hostile foreign power renders its existence a clear present and continuing danger to the security of the United States."[18] It also contains a legislative finding that the Communist Party is a "Communist-action organization" within the meaning of the Internal Security Act of 1950 and provides that "knowing" members of the Communist Party are "subject to all the provisions and penalties" of that Act.[19] It furthermore sets up a new classification of "Communist-infiltrated organ-

---

[13] *Id.*, § 782 (3), (4).

[14] *Id.*, § 786.

[15] *Id.*, § 787.

[16] *Id.*, § 794 (a).

[17] *Id.*, §§ 784, 785, 789, 790.

[18] 50 U. S. C. (1955 Supp.) § 841.

[19] *Id.*, § 843.

izations"[20] and provides for the imposition of sanctions against them.

We examine these Acts only to determine the congressional plan. Looking to all of them in the aggregate, the conclusion is inescapable that Congress has intended to occupy the field of sedition. Taken as a whole, they evince a congressional plan which makes it reasonable to determine that no room has been left for the States to supplement it. Therefore, a state sedition statute is superseded regardless of whether it purports to supplement the federal law. As was said by Mr. Justice Holmes in *Charleston & Western Carolina R. Co.* v. *Varnville Furniture Co.*, 237 U. S. 597, 604:

> "When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go."

*Second,* the federal statutes "touch a field in which the federal interest is so dominant that the federal system [must] be assumed to preclude enforcement of state laws on the same subject." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S., at 230, citing *Hines* v. *Davidowitz, supra*.[21] Congress has devised an all-embracing program for resistance to the various forms of totalitarian aggression. Our external defenses have been strengthened, and a plan to

---

[20] *Id.*, § 782 (4A).

[21] It is worth observing that in *Hines* this Court held a Pennsylvania statute providing for alien registration was superseded by Title III of the same Act of which the commonly called Smith Act was Title I. Title II amended certain statutes dealing with the exclusion and deportation of aliens. The provisions of Title I involve a field of no less dominant federal interest than Titles II and III, in which Congress manifestly did not desire concurrent state action.

protect against internal subversion has been made by it. It has appropriated vast sums, not only for our own protection, but also to strengthen freedom throughout the world. It has charged the Federal Bureau of Investigation and the Central Intelligence Agency with responsibility for intelligence concerning Communist seditious activities against our Government, and has denominated such activities as part of a world conspiracy. It accordingly proscribed sedition against all government in the nation—national, state and local. Congress declared that these steps were taken "to provide for the common defense, to preserve the sovereignty of the United States as an independent nation, and to guarantee to each State a republican form of government . . . ." [22] Congress having thus treated seditious conduct as a matter of vital national concern, it is in no sense a local enforcement problem. As was said in the court below:

> "Sedition against the United States is not a *local* offense. It is a crime against the *Nation*. As such, it should be prosecuted and punished in the Federal courts where this defendant has in fact been prosecuted and convicted and is now under sentence.[23] It is not only important but vital that such prosecutions should be exclusively within the control of the Federal Government . . . ." [24]

*Third,* enforcement of state sedition acts presents a serious danger of conflict with the administration of the federal program. Since 1939, in order to avoid a hampering of uniform enforcement of its program by sporadic local prosecutions, the Federal Government has urged

---

[22] 50 U. S. C. § 781 (15).

[23] *United States* v. *Mesarosh* [Nelson], 116 F. Supp. 345, aff'd, 223 F. 2d 449, cert. granted, 350 U. S. 922.

[24] 377 Pa., at 76, 104 A. 2d, at 142.

local authorities not to intervene in such matters, but to turn over to the federal authorities immediately and unevaluated all information concerning subversive activities. The President made such a request on September 6, 1939, when he placed the Federal Bureau of Investigation in charge of investigation in this field:

"The Attorney General has been requested by me to instruct the Federal Bureau of Investigation of the Department of Justice to take charge of investigative work in matters relating to espionage, sabotage, and violations of the neutrality regulations.

"This task must be conducted in a comprehensive and effective manner on a national basis, and all information must be carefully sifted out and correlated in order to avoid confusion and irresponsibility.

"To this end I request all police officers, sheriffs, and all other law enforcement officers in the United States promptly to turn over to the nearest representative of the Federal Bureau of Investigation any information obtained by them relating to espionage, counterespionage, sabotage, subversive activities and violations of the neutrality laws." [25]

And in addressing the Federal-State Conference on Law Enforcement Problems of National Defense, held on August 5 and 6, 1940, only a few weeks after the passage of the Smith Act, the Director of the Federal Bureau of Investigation said:

"The fact must not be overlooked that meeting the spy, the saboteur and the subverter is a problem that must be handled on a nation-wide basis. An isolated incident in the middle west may be of little significance, but when fitted into a national pattern

---

[25] The Public Papers and Addresses of Franklin D. Roosevelt, 1939 Volume, pp. 478–479 (1941).

of similar incidents, it may lead to an important revelation of subversive activity. It is for this reason that the President requested all of our citizens and law enforcing agencies to report directly to the Federal Bureau of Investigation any complaints or information dealing with espionage, sabotage or subversive activities. In such matters, time is of the essence. It is unfortunate that in a few States efforts have been made by individuals not fully acquainted with the far-flung ramifications of this problem to interject superstructures of agencies between local law enforcement and the FBI to sift what might be vital information, thus delaying its immediate reference to the FBI. This cannot be, if our internal security is to be best served. This is no time for red tape or amateur handling of such vital matters. There must be a direct and free flow of contact between the local law enforcement agencies and the FBI. The job of meeting the spy or saboteur is one for experienced men of law enforcement." [26]

Moreover, the Pennsylvania Statute presents a peculiar danger of interference with the federal program. For, as the court below observed:

"Unlike the Smith Act, which can be administered only by federal officers acting in their official capacities, indictment for sedition under the Pennsylvania statute can be initiated upon an information made by a private individual. The opportunity thus present for the indulgence of personal spite and hatred or for furthering some selfish advantage or ambition need only be mentioned to be appreciated. Defense of the Nation by law, no less than by arms, should be a public and not a private undertaking. It is

---

[26] Proceedings, p. 23.

important that punitive sanctions for sedition *against the United States* be such as have been promulgated by the central governmental authority and administered under the supervision and review of that authority's judiciary. If that be done, sedition will be detected and punished, no less, wherever it may be found, and the right of the individual to speak freely and without fear, even in criticism of the government, will at the same time be protected." [27]

In his brief, the Solicitor General states that forty-two States plus Alaska and Hawaii have statutes which in some form prohibit advocacy of the violent overthrow of established government. These statutes are entitled anti-sedition statutes, criminal anarchy laws, criminal syndicalist laws, etc. Although all of them are primarily directed against the overthrow of the United States Government, they are in no sense uniform. And our attention has not been called to any case where the prosecution has been successfully directed against an attempt to destroy state or local government. Some of these Acts are studiously drawn and purport to protect fundamental rights by appropriate definitions, standards of proof and orderly procedures in keeping with the avowed congressional purpose "to protect freedom from those who would destroy it, without infringing upon the freedom of all our people." Others are vague and are almost wholly without such safeguards. Some even purport to punish mere membership in subversive organizations which the federal statutes do not punish where federal registration requirements have been fulfilled.[28]

---

[27] 377 Pa., at 74–75, 104 A. 2d, at 141.

[28] *E. g.,* compare Fla. Stat., 1953, § 876.02: "Any person who— . . . (5) Becomes a member of, associated with or promotes the interest of any criminal anarchistic, communistic, nazi-istic or fascistic organization, . . . [s]hall be guilty of a felony . . . ," with 50 U. S. C. § 783 (f): "Neither the holding of office nor membership in any

When we were confronted with a like situation in the field of labor-management relations, Mr. Justice Jackson wrote:

> "A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law." [29]

Should the States be permitted to exercise a concurrent jurisdiction in this area, federal enforcement would encounter not only the difficulties mentioned by Mr. Justice Jackson, but the added conflict engendered by different criteria of substantive offenses.

Since we find that Congress has occupied the field to the exclusion of parallel state legislation, that the dominant interest of the Federal Government precludes state intervention, and that administration of state Acts would conflict with the operation of the federal plan, we are convinced that the decision of the Supreme Court of Pennsylvania is unassailable.

We are not unmindful of the risk of compounding punishments which would be created by finding concurrent state power. In our view of the case, we do not reach the question whether double or multiple punishment for the same overt acts directed against the United States has constitutional sanction.[30] Without compelling

---

Communist organization by any person shall constitute per se a violation of subsection (a) or subsection (c) of this section or of any other criminal statute. The fact of the registration of any person under section 787 or section 788 of this title as an officer or member of any Communist organization shall not be received in evidence against such person in any prosecution for any alleged violation of subsection (a) or subsection (c) of this section or for any alleged violation of any other criminal statute."

[29] *Garner* v. *Teamsters Union*, 346 U. S. 485, 490–491.

[30] But see Grant, The *Lanza* Rule of Successive Prosecutions, 32 Col. L. Rev. 1309.

indication to the contrary, we will not assume that Congress intended to permit the possibility of double punishment. Cf. *Houston* v. *Moore*, 5 Wheat. 1, 31, 75; *Jerome* v. *United States*, 318 U. S. 101, 105.

The judgment of the Supreme Court of Pennsylvania is

*Affirmed.*

[For dissenting opinion of MR. JUSTICE REED, joined by MR. JUSTICE BURTON and MR. JUSTICE MINTON, see *post*, p. 512.]

APPENDIX.

Pennsylvania Penal Code § 207.

The word "sedition," as used in this section, shall mean:

Any writing, publication, printing, cut, cartoon, utterance, or conduct, either individually or in connection or combination with any other person, the intent of which is:

(a) To make or cause to be made any outbreak or demonstration of violence against this State or against the United States.

(b) To encourage any person to take any measures or engage in any conduct with a view of overthrowing or destroying or attempting to overthrow or destroy, by any force or show or threat of force, the Government of this State or of the United States.

(c) To incite or encourage any person to commit any overt act with a view to bringing the Government of this State or of the United States into hatred or contempt.

(d) To incite any person or persons to do or attempt to do personal injury or harm to any officer of this State or of the United States, or to damage or destroy any public property or the property of any public official because of his official position.

The word "sedition" shall also include:

(e) The actual damage to, or destruction of, any public property or the property of any public official, perpetrated because the owner or occupant is in official position.

(f) Any writing, publication, printing, cut, cartoon, or utterance which advocates or teaches the duty, necessity, or propriety of engaging in crime, violence, or any form of terrorism, as a means of accomplishing political reform or change in government.

(g) The sale, gift or distribution of any prints, publications, books, papers, documents, or written matter in any form, which advocates, furthers or teaches sedition as hereinbefore defined.

(h) Organizing or helping to organize or becoming a member of any assembly, society, or group, where any of the policies or purposes thereof are seditious as hereinbefore defined.

Sedition shall be a felony. Whoever is guilty of sedition shall, upon conviction thereof, be sentenced to pay a fine not exceeding ten thousand dollars ($10,000), or to undergo imprisonment not exceeding twenty (20) years, or both.

18 U. S. C. § 2385.

Whoever knowingly or willfully advocates, abets, advises, or teaches the duty, necessity, desirability, or propriety of overthrowing or destroying the government of the United States or the government of any State, Territory, District or Possession thereof, or the government of any political subdivision therein, by force or violence, or by the assassination of any officer of any such government; or

Whoever, with intent to cause the overthrow or destruction of any such government, prints, publishes, edits, issues, circulates, sells, distributes, or publicly displays any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of

overthrowing or destroying any government in the United States by force or violence, or attempts to do so; or

Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence; or becomes or is a member of, or affiliates with, any such society, group, or assembly of persons, knowing the purposes thereof—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction.

MR. JUSTICE REED, with whom MR. JUSTICE BURTON and MR. JUSTICE MINTON join, dissenting.

The problems of governmental power may be approached in this case free from the varied viewpoints that focus on the problems of national security. This is a jurisdictional problem of general importance because it involves an asserted limitation on the police power of the States when it is applied to a crime that is punishable also by the Federal Government. As this is a recurring problem, it is appropriate to explain our dissent.

Congress has not, in any of its statutes relating to sedition, specifically barred the exercise of state power to punish the same Acts under state law. And, we read the majority opinion to assume for this case that, absent federal legislation, there is no constitutional bar to punishment of sedition against the United States by both a State and the Nation.[1] The majority limits to the federal

---

[1] No problem of double punishment exists in this case. See the Court's opinion, p. 499, and its last paragraph, p. 509. See *United States* v. *Lanza,* 260 U. S. 377, 382; The Federalist, No. 32. Cf. *Houston* v. *Moore,* 5 Wheat. 1, statement at p. 22 with that at pp. 44–45.

courts the power to try charges of sedition against the Federal Government.

First, the Court relies upon the pervasiveness of the antisubversive legislation embodied in the Smith Act of 1940, 18 U. S. C. § 2385, the Internal Security Act of 1950, 64 Stat. 987, and the Communist Control Act of 1954, 68 Stat. 775. It asserts that these Acts in the aggregate mean that Congress has occupied the "field of sedition" to the exclusion of the States. The "occupation of the field" argument has been developed by this Court for the Commerce Clause and legislation thereunder to prevent partitioning of this country by locally erected trade barriers. In those cases this Court has ruled that state legislation is superseded when it conflicts with the comprehensive regulatory scheme and purpose of a federal plan. *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148. The two cases cited by the Court to support its argument that the broad treatment of any subject within the federal power bars supplemental action by States are of this nature. In our view neither case is apposite to the Smith Act. The *Varnville* case dealt with general regulation of interstate commerce making the originating carrier liable to the holder of its interstate bill of lading for damage caused by a common carrier of property. This Court held that the section through the federal commerce power superseded a state right of action against a nonoriginating carrier for damages and a penalty for injury occurring on another line. The pertinent section, 34 Stat. 595, § 7, expressed a controlling federal policy for this commerce. The *Rice* case dealt with regulations of warehouses. We barred state action in that area because the Act declared that the authority it conferred "shall be exclusive with respect to all persons securing a license" under the Act. 331 U. S., at 224 and 233.

But the federal sedition laws are distinct criminal statutes that punish willful advocacy of the use of force

against "the government of the United States or the government of any State." These criminal laws proscribe certain local activity without creating any statutory or administrative regulation. There is, consequently, no question as to whether some general congressional regulatory scheme might be upset by a coinciding state plan.[2] In these circumstances the conflict should be clear and direct before this Court reads a congressional intent to void state legislation into the federal sedition acts.[3] Chief Justice Marshall wrote:

> "To interfere with the penal laws of a State, where they . . . have for their sole object the internal government of the country, is a very serious measure, which Congress cannot be supposed to adopt lightly, or inconsiderately. . . . It would be taken deliberately, and the intention would be clearly and unequivocally expressed." *Cohens* v. *Virginia*, 6 Wheat. 264, 443.

Moreover, it is quite apparent that since 1940 Congress has been keenly aware of the magnitude of existing state legislation proscribing sedition. It may be validly assumed that in these circumstances this Court should not void state legislation without a clear mandate from Congress.[4]

---

[2] Hunt, Federal Supremacy and State Anti-Subversive Legislation, 53 Mich. L. Rev. 407, 427–428; Note, 55 Col. L. Rev. 83, 90.

[3] *Gilbert* v. *Minnesota,* 254 U. S. 325, 328–333; *Reid* v. *Colorado,* 187 U. S. 137, 148; *Sinnot* v. *Davenport,* 22 How. 227, 243; *Fox* v. *Ohio,* 5 How. 410, 432–435.

[4] Forty-two States, along with Alaska and Hawaii, now have laws which penalize the advocacy of violent overthrow of the federal or state governments. Digest of the Public Record of Communism in the United States (Fund for the Republic, 1955) 266–306. In hearings before the House Judiciary Committee on the proposed Smith Act, both witnesses and members of the Committee made references to existing state sedition laws. Hearings before Subcommittee No. 3, Committee on the Judiciary, House of Representatives, on H. R. 5138,

We cannot agree that the federal criminal sanctions against sedition directed at the United States are of such a pervasive character as to indicate an intention to void state action.

Secondly, the Court states that the federal sedition statutes touch a field "in which the federal interest is so dominant" they must preclude state laws on the same subject. This concept is suggested in a comment on *Hines* v. *Davidowitz*, 312 U. S. 52, in the *Rice* case, at 230. The Court in *Davidowitz* ruled that federal statutes compelling alien registration preclude enforcement of state statutes requiring alien registration. We read *Davidowitz* to teach nothing more than that, when the Congress provided a single nation-wide integrated system of regulation so complete as that for aliens' registration (with fingerprinting, a scheduling of activities, and continuous information as to their residence), the Act bore so directly on our foreign relations as to make it evident that Congress intended only one uniform national alien registration system.[5]

---

76th Cong., 1st Sess., pp. 7, 69, 83–85. Similar comment was heard in the congressional debates. 84 Cong. Rec. 10452. In fact, the Smith Act was patterned on the New York Criminal Anarchy Statute. *Commonwealth* v. *Nelson*, 377 Pa. 58, 86, 104 A. 2d 133, 147. The original text of the Smith Act is set out in the hearings before Subcommittee No. 3, *supra*, p. 1, and the New York Act may be read in *Gitlow* v. *New York*, 268 U. S. 652, 654–655. Further evidence of congressional notice of state legislation may be found since the passage of the Smith Act. S. Rep. No. 1358, 81st Cong., 2d Sess., p. 9; H. R. Rep. No. 2980, 81st Cong., 2d Sess., p. 2; H. R. Rep. No. 1950, 81st Cong., 2d Sess., pp. 25–46 (Un-American Activities Committee). See 67 Harv. L. Rev. 1419, 1420; 40 Cornell L. Rev. 130, 133.

[5] In *Allen-Bradley Local* v. *Board*, 315 U. S. 740, 749, we said: "In the *Hines* case, a federal system of alien registration was held to supersede a state system of registration. But there we were dealing with a problem which had an impact on the general field of foreign relations. The delicacy of the issues which were posed alone raised grave questions as to the propriety of allowing a state system

We look upon the Smith Act as a provision for controlling incitements to overthrow by force and violence the Nation, or any State, or any political subdivision of either.[6] Such an exercise of federal police power carries, we think, no such dominancy over similar state powers as might be attributed to continuing federal regulations concerning foreign affairs or coinage, for example.[7] In the responsibility of national and local governments to protect themselves against sedition, there is no "dominant interest."

---

of regulation to function alongside of a federal system. In that field, any 'concurrent state power that may exist is restricted to the narrowest of limits.' p. 68. Therefore, we were more ready to conclude that a federal Act in a field that touched international relations superseded state regulation than we were in those cases where a State was exercising its historic powers over such traditionally local matters as public safety and order and the use of streets and highways."

The *Davidowitz* case is distinguishable on other grounds. Alien registration is not directly related to control of undesirable conduct; consequently there is no imperative problem of local law enforcement. 102 Pa. L. Rev., at 1091. There is also considerable legislative history behind the Alien Registration Act which suggests that Congress was trying to avoid overburdening of aliens; some features of the conflicting state law had been expressly rejected by Congress. 312 U. S., at 71–73. See 39 Minn. L. Rev. 213. It should be noted also that the coincidence between the state and federal laws in the *Davidowitz* case was so great that no real purpose was served by the state law. 34 Boston U. L. Rev. 514, 517–518.

States are barred by the Constitution from entering into treaties and by 18 U. S. C. § 953 from correspondence or intercourse with foreign governments with relation to their disputes or controversies with this Nation.

[6] Such efforts may be punishable crimes. *Dennis* v. *United States*, 341 U. S. 494, 508–510.

[7] It seems quite reasonable to believe "that the exclusion principle is to be more strictly applied when the Congress acts in a field wherein the constitutional grant of power to the federal government is exclusive, as in its right to protect interstate commerce and to control international relations." *Albertson* v. *Millard*, 106 F. Supp. 635, 641.

We are citizens of the United States and of the State wherein we reside and are dependent upon the strength of both to preserve our rights and liberties. Both may enact criminal statutes for mutual protection unless Congress has otherwise provided. It was so held in *Gilbert* v. *Minnesota,* 254 U. S. 325. In *Gilbert* the federal interest in raising armies did not keep this Court from permitting Minnesota to punish persons who interfered with enlistments (*id.,* at 326), even though a comprehensive federal criminal law proscribed identical activity. 40 Stat. 553. We do not understand that case as does the majority. In our view this Court treated the Minnesota statute only alternatively as a police measure, p. 331. Minnesota made it unlawful to advocate "that men should not enlist in the military or naval forces of the United States." It was contended, pp. 327–328, that the power to punish such advocacy was "conferred upon Congress and withheld from the States." This Court ruled against the contention, saying:

"An army, of course, can only be raised and directed by Congress, in neither has the State power, but it has power to regulate the conduct of its citizens and to restrain the exertion of baleful influences against the promptings of patriotic duty to the detriment of the welfare of the Nation and State. To do so is not to usurp a National power, it is only to render a service to its people, . . . ." *Id.,* at 330–331.[8]

---

[8] Mr. Justice Brandeis, dissenting, emphasized the ruling here applicable thus:

"Congress has the exclusive power to legislate concerning the Army and the Navy of the United States, and to determine, among other things, the conditions of enlistment. . . .

". . . The States act only under the express direction of Congress. . . .

". . . As exclusive power over enlistments in the Army and the Navy of the United States and the responsibility for the conduct of war is vested by the Federal Constitution in Congress, legislation by

Thirdly, the Court finds ground for abrogating Pennsylvania's antisedition statute because, in the Court's view, the State's administration of the Act may hamper the enforcement of the federal law. Quotations are inserted from statements of President Roosevelt and Mr. Hoover, the Director of the Federal Bureau of Investigation, to support the Court's position. But a reading of the quotations leads us to conclude that their purpose was to gain prompt knowledge of evidence of subversive activities so that the federal agency could be fully advised. We find no suggestion from any official source that state officials should be less alert to ferret out or punish subversion. The Court's attitude as to interference seems to us quite contrary to that of the Legislative and Executive Departments. Congress was advised of the existing state sedition legislation when the Smith Act was enacted and has been kept current with its spread.[9] No declaration of exclusiveness followed. In this very case the Executive appears by brief of the Department of Justice, *amicus curiae.* The brief summarizes this point:

> "The administration of the various state laws has not, in the course of the fifteen years that the federal and state sedition laws have existed side by side, in fact interfered with, embarrassed, or impeded the enforcement of the Smith Act. The significance of this absence of conflict in administration or enforce-

a State on this subject is necessarily void unless authorized by Congress. . . . Here Congress not only had exclusive power to act on the subject; it had exercised that power directly by the Espionage Law before Gilbert spoke the words for which he was sentenced. . . . The States may not punish treason against the United States . . . although indirectly acts of treason may affect them vitally. No more may they arrogate to themselves authority to punish the teaching of pacifism which the legislature of Minnesota appears to have put into that category." *Id.,* at 336–343.

[9] See note 4, *supra.*

ment of the federal and state sedition laws will be appreciated when it is realized that this period has included the stress of wartime security requirements and the federal investigation and prosecution under the Smith Act of the principal national and regional Communist leaders." [10] *Id.,* at 30–31.

Mere fear by courts of possible difficulties does not seem to us in these circumstances a valid reason for ousting a State from exercise of its police power. Those are matters for legislative determination.

Finally, and this one point seems in and of itself decisive, there is an independent reason for reversing the Pennsylvania Supreme Court. The Smith Act appears in Title 18 of the United States Code, which Title codifies the federal criminal laws. Section 3231 of that Title provides:

> "Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

That declaration springs from the federal character of our Nation. It recognizes the fact that maintenance of order and fairness rests primarily with the States. The section was first enacted in 1825 and has appeared successively in the federal criminal laws since that time.[11] This Court has interpreted the section to mean that States may provide concurrent legislation in the absence of explicit congressional intent to the contrary. *Sexton* v. *California,* 189 U. S. 319, 324–325. The majority's position in this case

---

[10] The brief added, p. 31: ". . . the Attorney General of the United States recently informed the attorneys general of the several states . . . that a full measure of federal-state cooperation would be in the public interest. See *New York Times,* Sept. 15, 1955, p. 19."

[11] 4 Stat. 115, 122–123; 18 U. S. C. A. § 3231 (Historical and Revision Notes).

cannot be reconciled with that clear authorization of Congress.

The law stands against any advocacy of violence to change established governments. Freedom of speech allows full play to the processes of reason. The state and national legislative bodies have legislated within constitutional limits so as to allow the widest participation by the law enforcement officers of the respective governments. The individual States were not told that they are powerless to punish local acts of sedition, nominally directed against the United States. Courts should not interfere. We would reverse the judgment of the Supreme Court of Pennsylvania.