THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* DEUSDEDIT MARRERO NAZARIO, Defendant an Appellant.

No. 15612. Argued May 1, 1956.—Decided October 3, 1956.

---

612

*Ramón H. Vargas, Luis A. Garrastegui* and *Pablo M. García* for appellant. *J. B. Fernández Badillo, Acting Attorney General,* and *Jaime García Blanco, Special Fiscal of the Supreme Court,* for appellee.

JUDGMENT

San Juan, Puerto Rico, October 3, 1956

For the reasons hereafter set forth, the judgment rendered on November 21, 1951, in the above-entitled case, by the Superior Court, Arecibo Part, from which an appeal has been taken, is reversed and defendant acquitted.

It was so decreed and ordered by the Court as witness the signature of the Chief Justice. Mr. Justice Marrero, Mr. Justice Negrón Fernández, and Mr. Justice Belaval, dissented.

A. C. SNYDER
Chief Justice

I certify:
IGNACIO RIVERA
 Secretary

Opinion of MR. CHIEF JUSTICE SNYDER in which MR. JUSTICE
PÉREZ PIMENTEL concurs.

December 14, 1956.

I voted to reverse the Judgment and to acquit the defend-
ant because in my opinion the evidence adduced at the trial
did not establish beyond a reasonable doubt that the defendant
was guilty of *the charge contained in the information.*

 In the light of the reasoning in the opinion of Mr.
Justice Sifre, I agree there is a possibility that the Supreme
Court of the United States will eventually hold that *Com-
munists* advocating overthrow of a *State* government by
force and violence may be punished criminally only by the
Federal government while the Smith Act is in effect. But
it has not yet so held.[1] While that substantial constitutional
question remains open, I think we should apply in the present
case the well-established rule that such constitutional ques-
tions should be avoided where a case can be decided on other
grounds.[2] The evidence contained in the record does not in

---

[1] *Pennsylvania* v. *Nelson,* 350 U. S. 497, holds that the Smith Act—54
Stat. 670, 18 U.S.C. § 2385—supersedes the Pennsylvania Sedition Act
insofar as the latter prohibits advocacy by Communists of the overthrow
of the *Government of the United States* by force and violence. However,
it leaves open the question of the power of a *state* to make punishable
such advocacy of the overthrow of a *State* government by force and vio-
lence. *Cf. Commonwealth* v. *Gilbert,* 134 N.E.2d 13 (Mass., 1956) ; *Braden*
v. *Commonwealth,* 291 S.W. 2d 843 (Ky., 1956) ; *Nelson* v. *Wyman,* 105
A.2d 756, 769–70 (N.H., 1954) ; *Wyman* v. *Sweezy,* 121 A.2d 783 (N.H.,
1956), cert. granted, 352 U.S. 812, 25 U.S.L. Week 3093; *Kahn* v. *Wyman,*
123 A.2d 166, (N.H., 1956) ; Hunt, *Federal Supremacy and State Anti-
Subversive Legislation,* 53 Mich. L. Rev. 407; *Albertson* v. *Millard,* 106
F. Supp. 635 (U.S. Dist. Ct., Mich., 1952), judgment vacated in 345 U. S.
242; The Supreme Court 1955 Term, 70 Harv. L.Rev. 83, 116–20 (Nov.,
1956). In addition, even if this question is ultimately decided against a
*State,* the problem would remain as to the effect of such a decision on a
Puerto Rican criminal statute against local subversive conduct. See *Ca-
rrión* v. *González,* 125 F. Supp. 819 (U.S. Dist.Ct., P.R., 1954) and foot-
note 2, *infra.*

[2] ". . . [A]ll courts wisely avoid constitutional questions wherever
possible." *Buscaglia, Treas.* v. *Tax Court,* 71 P.R.R. 278, 281, citing
*District of Columbia* v. *Little,* 339 U. S. 1, *Buscaglia* v. *Fiddler,* 157 F.2d
579 (C.A.1, 1946) ; *Walker* v. *Tax Court,* 72 P.R.R. 651, 658, footnote 10.
As we pointed out in 71 P.R.R. at 283: ". . . [C]onstitutional questions
lurking in the background may possibly disappear as a result of the find-
ings of fact . . .".

my view support the verdict of guilty. Accordingly, I believe we should rest our judgment on that basis rather than on the theory that if and when the problem is presented to it, the Supreme Court of the United States will hold that the Smith Act bars prosecution of Communists under Act No. 53.

Since this is not a majority opinion, it would serve no useful purpose to analyze in detail the testimony in this case. I feel, however, that I should make some general observations concerning the nature of the charge and the evidence which was introduced in the effort to prove it.

The defendant was *not* charged with being a member of the Communist Party, knowing that the latter advocates the overthrow of our Government by force and violence.[3] This is *not* a conspiracy charge; the defendant was accused *alone* of advocating the overthrow of the government by force and

It seems particularly unnecessary to speculate here as to the scope of the *Nelson* case in view of the following: First, so far as we are aware, this is the only case in which a Communist has been prosecuted under Act No. 53. It therefore seems unlikely that this particular constitutional problem will arise again. Second, a holding against the power of *a State of the Union* to deal with Communistic subversive activity would not necessarily strike down a Puerto Rican criminal statute covering such activity, whether our statute was enacted (a) prior or (b) subsequent to July 25, 1952. As to (a), *cf. Puerto Rico* v. *Shell Co.*, 302 U.S. 253, 271; *Irizarry* v. *District Court*, 64 P.R.R. 90, 95–96; *Ballester Hermanos* v. *Tax Court*, 66 P.R.R. 531, 547, footnote 17, reversed on other grounds, 162 F.2d 805 (C.A. 1, 1947), cert. denied, 332 U.S. 816; *People* v. *Burgos*, 75 P.R.R. 517, 527–30, and cases cited; *Postley* v. *Secretary of the Treasury*, 75 P.R.R. 822, 843. As to (b), *cf. González* v. *Superior Court*, 75 P.R.R. 550, 571; *Carrión* v. *González, supra; People* v. *Figueroa*, 77 P.R.R. 175, affirmed in 232 F.2d 615 (C.A. 1, 1956), and cases cited in both opinions; *Puerto Rico Labor Relations Board* v. *Ortega, post*, pp. 714, 717–8, footnote 4.

[3] He could not have been so charged: Act No. 53 was not amended to make such membership an offense until after the alleged offense herein was committed on or before October 30, 1950. Act No. 53, Laws of Puerto Rico, 1948, Sixth, Seventh and Eighth Special Sessions, as amended by Act No. 13 of December 20, 1950, Laws of Puerto Rico, Fifth to Twelfth Special Sessions, 1950–51; 33 L.P.R.A. § 1471.

A charge of membership, knowing the purpose of the Communist Party, under Act No. 53 as amended by Act No. 13 of December 20, 1950, would raise—in addition to the preemption question, see footnote 1—constitutional

violence.[4] It was therefore necessary for the government to prove beyond a reasonable doubt that the defendant *personally* engaged in such prohibited advocacy as restrictively defined in the *Dennis* case.[5] Moreover, under the information herein the acts, conduct and advocacy of other Communists or Nationalists were not admissible in evidence against the defendant, in the absence of evidence connecting him therewith.

As I read the record, it contains no testimony whatsoever showing that the defendant *personally* advocated force and violence *in the manner delineated in the Dennis case*, see footnote 5. Indeed, there was very little testimony concerning the defendant's own statements and acts; and none of his exhortations, however much we may disagree with them, rises to the level of the kind of testimony described in the *Dennis* case as needed to convict under the charge before us.

---

questions which are pending decision by the Supreme Court of the United States. *Scales* v. *United States,* 227 F.2d 581 (C.A. 4, 1955), cert. granted, 350 U.S. 992; *United States* v. *Lightfoot,* 228 F.2d 861 (C.A. 7, 1956), cert. granted, 350 U.S. 992. The arguments of the *Scales* and *Lightfoot* cases before the Supreme Court are summarized in U.S.L. Week 3109–11 (October 16, 1956).

[4] The defendant was accused of violating only par. 1 of § 1 of Act No. 53. See *People* v. *Burgos, supra,* 522, 531, footnote 11.

[5] Act No. 53 is substantially similar to the Smith Act. *People* v. *Reynolds,* 77 P.R.R. 421, 429, footnote 7; *People* v. *Burgos, supra.* And Act No. 53 must meet the same constitutional test to which the Smith Act was subjected. *Cf.* Antieau, *The Rule of Clear and Present Dangers: Scope of its Applicability,* 48 Mich.L.Rev. 811, 816–20. In that connection, for present purposes, there are two important points. First, an essential element of such a crime is ". . . *proof of the intent* . . . to overthrow the Government by force and violence." *Dennis* v. *United States,* 341 U.S. 494, 499, 512 (italics ours); *People* v. *Burgos, supra,* p. 531. Second, the doctrine of "clear and present danger" means in this context that the prosecution is required to prove that the defendant intended to cause the overthrow of the government as speedily as circumstances permitted, *Dennis* v. *United States, supra,* pp. 509–11; or, stated another way in the language used by Chief Judge Learned Hand in the Court of Appeals as quoted with approval by the Supreme Court in the *Dennis* case at p. 510: "In each case [courts] must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger."

See Auerbach, *The Communist Control Act of 1954: a Proposed Legal-*

The record does contain hundreds of pages of testimony—admitted over the defendant's objection—describing in great detail various episodes of violence in which Nationalists engaged on October 30, 1950.[6] But in my opinion none of this testimony was admissible against the defendant since the record is barren of proof connecting him personally with these acts of violence. Undoubtedly, the defendant was in sympathy with these acts of violence and expressed his ap-

*Political Theory of Free Speech*, 23 U.Chi. L.Rev. 173, 185–204; Richardson, *Freedom of Expression and the Function of Courts*, 65 Harv.L.Rev. 1, 8; *The Communist Control Act of 1954*, 64 Yale L.J. 712, 728; *Guadalupe* v. *Bravo, Warden*, 71 P.R.R. 913, 920, footnote 1. *Cf.* Rostow, *The Democratic Character of Judicial Review*, 66 Harv. L.Rev. 193, 216–23; Mendelson, *Clear and Present Danger—From Schenck to Dennis*, 52 Col.L.Rev. 313, 330–31; *Schneiderman* v. *United States*, 320 U.S. 118, at pp.157–58, as discussed by Learned Hand in the *Dennis* case, 183 F.2d at 211.

The foregoing two points are made in the plurality opinion written by Chief Justice Vinson and concurred in by three Associate Justices in the *Dennis* case. The concurring opinion of Mr. Justice Frankfurter does not, for our purposes, set up a different standard. See, *The Supreme Court, 1950 Term*, 65 Harv.L.Rev. 107, 129–31. Moreover, the plurality opinion has been followed by all the Courts of Appeal which have passed on the question. *United States* v. *Dennis*, 183 F.2d 201 (C.A. 2, 1950), affirmed, 341 U.S. 495; *Frankfeld* v. *United States*, 198 F.2d 679 (C.A. 4, 1952), cert. denied, 344 U.S. 922; *United States* v. *Flynn*, 216 F.2d 354 (C.A. 2, 1954), cert. denied, 348 U.S. 909; *United States* v. *Schneiderman*, 106 F.Supp. 906 (U.S. Dist. Ct., Cal., 1952), affirmed in *Yates* v. *United States*, 225 F.2d 146 (C.A. 9, 1955), cert. granted, 350 U.S. 860; *United States* v. *Mesarosh*, 223 F.2d 449 (C.A. 3, 1955), cert. granted, 350 U.S. 922, judgment reversed, *Mesarosh* v. *United States*, 352 U.S. 1, 25 U.S.L.Week 3113 (October 10, 1956); *Wellman* v. *United States*, 227 F.2d 757 (C.A. 6, 1955). I therefore believe we are bound by the language of Chief Justice Vinson on these two points as a matter of Federal due process. And the result I reach on the facts here makes it unnecessary for me to pass on the rights of the defendant under the Commonwealth Constitution.

[6] We take judicial notice of the general proposition that there was a Nationalist "revolt" in Puerto Rico on October 30, 1950. *Guadalupe* v. *Bravo, Warden, supra*, 918–19, 926. See *Cruz Vélez* v. *Liverpool & London & Globe Insurance Co.*, of this volume, *Home Ins. Co. of New York* v. *Dávila*, 212 F.2d 731, 733–35 (C.A. 1, 1954); *Albizu* v. *United States*, 88 F.2d 138 (C.A. 1, 1937), cert. denied, 301 U.S. 707. But it was necessary to introduce evidence implicating them personally in order to convict particular Nationalists either of crimes of violence or under Act No. 53. *People* v. *Reynolds, supra; People* v. *Burgos, supra; People v. Hernández*, 77 P.R.R. 437, 443 footnote 3. A fortiori, such evidence was necessary in the present case against the defendant, a Communist.

proval thereof while they were occurring and thereafter.[7] This was reprehensible of him and abhorrent to the peace-loving people of Puerto Rico. But such sympathy and approval, standing alone, do not constitute advocacy of the overthrow of the government by force and violence as prohibited by Act No. 53, which as we have seen must be read restrictively as set forth in the *Dennis* case, see footnote 5. *People* v. *Reynolds, supra.*[8]

The trial court permitted a police sergeant—based on his statement that he had read some books by Marx and Lenin—to give his sweeping opinion that the Communists

---

[7] There is no substantial evidence in the record showing any connection between the activities of the Nationalists and the Communists in Puerto Rico. Nor do we have anything before us to show prohibited concerted action and advocacy by the two parties, on or before October 30, 1950 or at any other time. Mutual sympathy between the parties as to the objective of the Nationalist Party undoubtedly existed. But here again this was not enough to make admissible in evidence on the charge before us the details of the 1950 Nationalist "revolt", in the absence of proof implicating the defendant *personally* in the advocacy or performance of these acts of violence.

[8] After pointing out in the *Reynolds* case that par. 1 of § 1 of Act No. 53 prohibits (p. 431) "subversive propaganda by mouth" which incites to action, this Court used language at p. 431 which I think is equally applicable here:

"The *Fiscal* might be right if appellants had been accused and convicted of belonging to or being affiliated with a subversive association with knowledge of its purpose, or of a conspiracy to commit the different acts prohibited by Act No. 53. However, The People was bound, under the information filed against appellants, to prove that they promoted, advocated, advised, or preached something which the law prohibits, namely, the necessity, desirability, and propriety of overthrowing, paralyzing, or destroying the Government of Puerto Rico by force or violence. Neither the oath taken by Ruth Reynolds nor her affiliation with the Nationalist Party, nor her attendance at different public functions held by that group, can be branded as criminal under subdivision 1 of Act No. 53. We are not deciding here whether or not the activities in which appellants are engaged constitute some other crime under Act No. 53. Our decision is confined to the facts appearing from the record of this case. Such facts, we repeat, do not constitute the offense charged against the appellants."

The same reasoning applies to the attendance of the defendant at Communist meetings and his applause of statements made at these meetings, even if it is assumed without deciding that the statements made at such meetings as disclosed by the record were inhibited under Act No. 53 as circumscribed by the *Dennis* case.

in Puerto Rico advocate the overthrow of the government by force and violence. I do not stop to determine whether this opinion of the sergeant was admissible in evidence. I note only that the books on which he relied were not introduced in evidence. More important, there was no showing that they were used by the defendant in the advocacy charged herein. In fact, there is nothing in the record to indicate that the defendant had read these books or had even ever heard of them.[9] This contrasts sharply with the careful, detailed, systematic evidence presented by the United States Government in all the Smith Act cases which I have been able to find. In the latter the books involved were not only introduced in evidence but also the defendant's knowledge and *use* thereof in advocating the overthrow of the Government by force and violence were established by abundant testimony. See cases cited in the last paragraph of footnote 5, and *Mesarosh* v. *United States*, 352 U.S. 1, 10, footnote 5, (Nov. 5, 1956). No testimony whatsoever of this type was offered in this case.[10]

---

[9] The testimony does show that the defendant distributed copies of "Verdad", the official Communist newspaper in Puerto Rico, and a pamphlet entitled "El Grito de Lares y la Actualidad Puertorriqueña", by César Andreu Iglesias. I find nothing in them which meets the test of the *Dennis* case, see footnote 5.

[10] Broadly speaking, we may take judicial notice of the world-wide activities of the Communist movement and its purposes. *Dennis* v. *United States*, 341 U. S. at pp. 510–11; *Communications Assn.* v. *Douds,* 339 U.S. 382, 424 *et seq.*, opinion of Mr. Justice Jackson; *United States* v. *Dennis*, 183 F.2d 201, 213 (C.A. 2, 1950) ; *United States* v. *Flynn, supra,* 367, footnote 9; *United States* v. *Schneiderman*, 106 F. Supp. at 922, and cases cited; Note, *Federal Anti-Subversive Legislation of 1954,* 55 Col.L.Rev. 631, 711, footnote 616. But we repeat once more that under the charge before us there must be some evidence showing advocacy by the defendant personally as defined in the *Dennis* case, see footnote 5. As pointed out by Richardson, *supra* p. 11: "Irrespective of whether the surrounding circumstances made the existing probability of the apprehended evil great or small, *evidence that the utterance in question made some contribution* toward increasing that probability seems essential." (Italics ours).

"Judges do not live in a vacuum. We know what the rest of the community knows." [11] I am aware that Communism is an international criminal conspiracy which threatens the democratic way of life in the free world at all levels—international, national and local. See footnote 10, to which should be added the recent events in Hungary. But ". . . it is of the essence of the institutions of liberty that it be recognized that guilt is personal and cannot be attributed to the holding of opinion . . .".[12] The government—*under the charge it brought here*—was required to show beyond a reasonable doubt that the defendant personally advocated steps which he specifically intended and were reasonably calculated to cause overthrow of the Government as speedily as circumstances permitted. *Dennis* v. *United States, supra,* as discussed in footnote 5. I cannot agree that the evidence in this case supports such a charge against the defendant.[13]

For the reasons stated, I concurred in the reversal of the judgment and the entry of a new judgment acquitting the defendant.

---

Opinion of MR. JUSTICE SIFRE in which MR. JUSTICE SALDAÑA concurs.

December 14, 1956.

██ Appellant was convicted of a violation of Act No. 53 of June 10, 1948 (Spec. Sess. Laws, p. 170), as subse-

---

[11] *Suárez* v. *Tugwell, Governor,* 67 P.R.R. 166, 174. See also, *Ballester* v. *Court of Tax Appeals,* 61 P.R.R. 460, where we said at pp. 489–90: "Yet our function, though a limited one, is not performed in a vacuum. When facts are overwhelming enough, even courts may take judicial notice of them, and thereby avoid in part the criticism of Bentham that the art of Jurisprudence consists of being methodically ignorant of what everybody knows."

[12] Chief Justice Hughes, quoted in *Schneiderman* v. *United States,* 320 U.S. 118, 154, footnote 41.

[13] As Chief Justice Warren, speaking for the Court, said in another context the other day: "The government of a strong and free nation does not need convictions based on such testimony. It cannot afford to abide with them. The interests of justice call for a reversal of the judgments . . .". *Mesarosh* v. *United States, supra* 14, p. 12, slip opinion.

quently amended.[1] He appealed from the judgment rendered against him and, while the appeal was pending, he filed a supplementary brief urging his acquittal on the ground that, in view of the holding of the United States Supreme Court in *Pennsylvania* v. *Nelson*, 350 U.S. 497, "The People of Puerto Rico lacked power to enforce Act No. 53 . . . , since the Federal Government had occupied the field of sedition and subversive acts by legislating against such conduct," referring to the Smith Act, 18 U.S.C. § 2385, which proscribes seditious conduct against the "government of the United States or the government of any State, Territory, District or Possession thereof . . ." The judgment was reversed by a majority and I concurred in the result because, even though I can not agree that the Legislative Assembly of Puerto Rico was without power to enact Act No. 53, as erroneously contended by appellant, I am of the opinion that, in the light of the decision in the *Nelson* case, the activities which led to the conviction of the defendant in the case at bar, even if they constitute an offense, were outside the orbit of that Act and within the field of sedition in which federal jurisdiction is exclusive.

I have reached the foregoing conclusion, aware of the fact that the question reviewed in *Pennsylvania* v. *Nelson*, *supra*, was the decision of the Supreme Court of Pennslyvania setting aside Nelson's conviction for subversive conduct *against the National Government, under the Sedition Act of*

---

[1] Act No. 53, as it stood at the time of the occurrence of the acts which gave rise to the prosecution, in its pertinent part read as follows:

"Section 1.—The commission by any person of any of the following acts, shall constitute a felony punishable by a maximum penalty of ten (10) years imprisonment in the penitentiary, or by a maximum fine of ten thousand (10,000) dollars, or by both penalties:

"1. To promote, advocate, advise or preach, wilfully or knowingly, the necessity, desirability, or expediency of overthrowing, paralyzing, or subverting the Insular Government, or any political subdivision thereof, by means of force or violence;

"2. To print, publish, edit, circulate, sell, distribute, or publicly exhibit, with the intent of overthrowing, paralyzing or subverting the Insular Government or any political subdivision thereof, any writing

*that state, which prohibited subversive acts against the Government of the United States as well as against the local government, Commonwealth v. Nelson,* 377 Pa. 58, 104 A. 2d 133, and conscious of the words of the Supreme Court in its opinion to the effect that "all that is before us for review, is that the Smith Act of 1940, as amended in 1948, which prohibits the knowing advocacy of the overthrow of the Government of the United States by force and violence, supersedes the enforceability of the Pennsylvania Sedition Act which proscribes the same conduct." This notwithstanding, the underlying reasons in the *Nelson* case are, in my view, applicable to an action brought in a court of a state, territory, etc., for subversive acts against the Government of the United States, as well as to a prosecution for subversive acts which allegedly constitute an offense against the local government, if such acts by their nature or character are in effect within the field of sedition covered by the congressional legislation mentioned by the Supreme Court. See *Commonwealth v. Gilbert,* 134 N.E. 2d 13.

That Supreme Court stated that "Where, as in the instant case, Congress has not stated specifically whether a federal statute has occupied a field in which the States are otherwise free to legislate, different criteria have furnished touchstones for decision." It found that "each of several tests of supersession" was met, to wit: (1) the scheme of federal regulation is so pervasive as to infer that Congress left no room for the States to supplement it. It identified such scheme by referring to the Smith Act, to the general criminal conspiracy provisions, 18 U.S.C. § 371, to the In-

---

or publication by which the necessity, desirability, or convenience of overthrowing, paralyzing, or subverting the Insular Government, or any political subdivision thereof, by means of force or violence, is promoted, advocated, advised or preached;

"3. To organize or help to organize any association, group or assembly of persons who promote, advocate, advise, or preach the overthrowing or subverting of the Insular Government, or any subdivision thereof, by means of force or violence."

ternal Security Act of 1950, 50 U.S.C. § 781 *et seq.*, and the Communist Control Act of 1954, 50 U.S.C. § 841 *et seq.*, in which it is declared "that the Communist Party of the United States, although purportedly a political party, is in fact an instrumentality of a conspiracy to overthrow the Government of the United States," and that "its role as the agency of a hostile foreign power renders its existence a clear present and continuing danger to the security of the United States"; (2) the federal statutes touch a field in which the federal interest is so dominant that the federal system must be assumed to preclude enforcement of state laws on the same subject. In this connection, the Court stated that "Congress has devised an all-embracing program for resistance to the various forms of totalitarian aggression," adding that through such scheme "our external defenses have been strengthened, and a plan to protect against internal subversion has been made by it. It has appropriated vast sums, not only for our own protection, but also, to strengthen freedom throughout the world. It has charged the Federal Bureau of Investigation and the Central Intelligence Agency with responsibility for intelligence concerning Communist seditious activities against our Government, and has denominated such activities as part of a world conspiracy. It accordingly proscribed sedition against all government in the nation—national, state and local." The Supreme Court went on to observe that "Congress declared that these steps were taken 'to provide for the common defense, to preserve the sovereignty of the United States as an independent nation, and to guarantee to each State a republican form of government . . . .' "; and, lastly, (3) a "serious danger of conflict with the administration of the federal program," which is described in the opinion.

Deusdedit Marrero Nazario was prosecuted because "*on or about October 30, 1950, and prior to this date, before the filing of this information,* and in the Municipality of Are-

cibo . . . , he illegally, maliciously, criminally, willfully, and knowingly, being an active Communist, . . . made statements and propaganda among different groups of persons promoting, advocating, advising, and preaching the necessity, desirability, and expediency of overthrowing, paralyzing and subverting the Insular Government of Puerto Rico and the political subdivisions thereof by means of force and violence, *all of which the defendant herein carried out at a time when a revolt was under way, incited by members of a group known as 'Nationalist Party of Puerto Rico,' aimed at securing the separation of Puerto Rico from the United States by means of force and violence.*" (Italics ours.) As has been noted, the prosecution not only charged appellant with promoting, advocating, advising, and preaching "the necessity, desirability, and expediency of overthrowing, paralyzing, and subverting the Insular Government of Puerto Rico . . . ," on October 30, 1950, but also charged him with performing those acts prior to that date.

The record reveals the evidence presented and submitted to the jury by The People in support of the charges contained in the information. The prosecuting attorney introduced evidence to show that in 1942 the defendant was an active Communist, a member of the Communist Party of Puerto Rico, and that since then he took part in the activities of that party, advocating on different occasions and in different places the overthrow of the local government and the separation of Puerto Rico from the United States "in any manner whatever," as a means of establishing here a Communist régimé. One of the witnesses for the prosecution testified that at an assembly held by the Communist Party in 1946, which appellant attended as a delegate of the Communist Section of Caguas, the party voted for the independence of Puerto Rico and resolved to advocate the Marxist-Leninite principles and the revolutionary principles and doctrines, as advocated by the Communist Party of Russia with which

the local Communist movement was affiliated.[2] That witness also testified that "the Communist parties throughout the world do not restrict their activities to the country or place or the state where they carry on their functions, but that it is an international movement"; that "the Communist theory dismisses the possibility of establishing a proletarian republic, *i. e.*, of setting up a Communist government without first wiping out the propertied class; and this being the first phase of the movement to destroy capitalism, which is the force represented by the State, it is first necessary to destroy the machinery of government so that there be no antagonism; then, there being no machinery of government, a proletarian dictatorship is forthwith established and this is accomplished through a revolution, a 'fight,' 'violent' revolution, 'armed' struggle." He also testified that according to the Puerto Rican Communist Party, it is impossible "to create, to set up the republic of Puerto Rico without first having a revolution of a fighting and violent type." Upon questioned whether it would be possible to set up in the Island the form of government advocated by the Puerto Rican Communists, "maintaining the relations which now exist with the United States of America," he answered in the negative.

As to the events of October 30, 1950, the prosecuting attorney himself gives us the full details revealed by the evidence regarding appellant. I copy from his brief: "On October 30, 1950, he was in the Public Welfare Office of Arecibo, where he used to work and took every opportunity to

---

[2] The People introduced evidence that William Foster, President of the Communist Party of the United States, addressed a meeting of the Communist Party of Puerto Rico in 1948, and stated, among other things, that that party offered full cooperation to the Communists of Puerto Rico. It also introduced evidence to show that at that meeting, Juan Santos Rivera, then Secretary of the Communist Party of Puerto Rico, stated "that the imperialism of the United States had prevented Dr. Marinelo of Cuba from visiting Puerto Rico; that they had, nonetheless, a record of the speech which Dr. Marinelo intended to make . . ."; that "Dr. Marinelo is a Cuban citizen and is identified with the world Communist movement."

praise the Communist doctrine and attack the system of the established government of our Island. (Tr. Ev. 210–12, 265 *et seq.*). He boasted of his Communist filiation, gave the party salute (Tr. Ev. 213, 257), and emphasized the need for overthrowing the present government in order to set up a Communist government (Tr. Ev. 212). When, near that office, a group of Nationalists were attacking and firing against police headquarters, he said, 'Today I feel really proud of being a Puerto Rican' (Tr. Ev. 217, 261), referring to the fact that 'they were attacking the police headquarters and had killed several policemen, and that this is the way of overthrowing the government' (Tr. Ev. 217). He emphasized that 'what they are doing is the right thing' (Tr. Ev. 219). He rejoiced and said that that was 'the best way of overthrowing the government' (Tr. Ev. 260)."

I have mentioned in general terms the evidence presented to the jury solely for the purpose of pointing out that the defendant was actually convicted for his association with the Communist Party and for his Communist background and activities.

I have not mentioned the evidence as a ground to determine whether or not it was sufficient to prove that Marrero Nazario promoted, advocated, advised, and preached the necessity, desirability, and expediency of overthrowing, paralyzing, and subverting the Government of Puerto Rico and the political subdivisions thereof by means of violence, in violation of the provisions of Act No. 53. I have done so to show that appellant was tried and convicted without legal authority for acts which, had they been subversive and constituted an offense, a question on which I have expressed no opinion, were in the field of sedition in which the federal jurisdiction is exclusive, as I read the opinion in the *Nelson* case, since the acts charged were Communist seditious acts. Activities of that nature represent a danger to the survival of the *whole nation*, even if they are directed against a par-

ticular local government. They constitute a problem of national concern and it has been so considered and treated by the Congress, which has granted to the Federal Government ample and sufficient power to protect itself against such activities and also to protect the states, territories, etc.

My attention is focused on the essential facts of the case at bar, on the fact that appellant was convicted, as I have noted, without legal authority, a question which in my opinion can not be eluded.

The foregoing conclusion does not mean that Puerto Rico can not defend itself against subversive acts. Our Legislative Assembly, I repeat, could enact Act No. 53 to embrace seditious acts not included in the field of sedition occupied exclusively by the Federal Government. I shall have occasion to express my opinion in another case which is before this Court as to seditious conduct in the orbit of that Act.

I do not agree with the view expressed by Mr. Justice Negrón Fernández, in his dissenting opinion, that the *Nelson* case does not apply to the case at bar for the reasons set forth therein, a view which in my judgment is based on premises not supported by the evidence. I repeat that the evidence shows that the defendant was convicted of Communist activities in which he was engaged during several years prior to October 30, 1950, and on which The People presented evidence which was considered by the jury.[3] The defendant's doings on that day in connection with the events brought about by members of the Nationalist Party are recited by the *Fiscal* in the manner already stated. There is hardly

---

[3] I copy the following from the brief offered by the *Fiscal:*

"Abundant evidence was also offered as to the nature of the campaign conducted by the Communist Party in Puerto Rico and, particularly, on its political philosophy, as advocated by its highest exponents at the different meetings which the defendant attended. At those activities they always preached that it was necessary to bring to an end, defeat, and overthrow, in any form or manner whatever, the party in power, the established government of Puerto Rico, (Tr. Ev. 106–08, 110–11, 148, 152, 162, 177, 200, 401); that the

any justification in those doings for these conclusions of Mr. Justice Negrón Fernández: "If in this case it had not been alleged or proved that acts of such a nature took place while a Nationalist revolt was under way, in which force and violence were used in order to overthrow the Insular Government, I would have been inclined to agree that, in the light of the holding in the *Pennsylvania* v. *Nelson* case, *supra*, the jurisdiction to prosecute and try appellant herein could have rested exclusively with the United States District Court for Puerto Rico. However, in view of the averments and facts of this case, he was, in my opinion, properly tried by the lower court. Appellant, who in his testimony before the lower court admitted that he was an active Communist and was engaged in Communist propaganda for many years, took advantage of the fact that a Nationalist armed revolt was in full swing to advocate by word of mouth the overthrow of the Insular Government by means of force and violence. Such preachings constituted a coercive and inciting force for continuing the revolt already under way, aimed at overthrowing the Insular Government by the violent means which were being employed at that very moment. In view of such situation, it matters not that his teachings were prompted by the objectives of the Communist conspiracy; his activity ceased to be an isolated factor and was transformed into an active ingredient of the conspiracy which was being plotted, aimed at achieving the proximate objective of the latter, which was in full swing."

laboring class must 'rebel against that government in order to do away with it once and for all and thus build up the Communist Party' (Tr. Ev. 109), which could at least count, as was stated (Tr. Ev. 399), on the support of the Nationalist Party of Puerto Rico.

"Evidence was also presented to the effect that the Communist Party advocates in Puerto Rico the Marxist-Leninite theories, as predicated by the Communist Party of Russia (Tr. Ev. 388), which teach a doctrine of international revolutionary character (Tr. Ev. 406–08), with which the Puerto Rican movement is affiliated through the Communist International (Tr. Ev. 409)."

Marrero Nazario's "activity" on October 30, 1950, consisted of the statements, already transcribed, made to his fellow workers in the office. Although such statements are most reprehensible, I can not agree that they became an ingredient of the Nationalist conspiracy. No evidence was presented that appellant participated in that conspiracy, before or while it was being carried out.

This case arose while the Organic Act of 1917 was in force. There is no question of the legislative powers of Puerto Rico under its new Commonwealth status, and nothing I have said on the Smith Act and on Act No. 53 refers to such statutes in the light of the new status.

---

Opinion delivered by MR. JUSTICE SALDAÑA.

Although I agree with the opinion of Mr. Justice Sifre, I wish to make one further point: Since Act No. 53 of June 10, 1948 (Spec. Sess. Laws, p. 170) does not apply to the acts charged against the defendant and on which he was convicted, it is not necessary to decide here the very serious problem raised by the "transmutation" or "reinterpretation" of the constitutional principle of clear and present danger enunciated in the plurality opinion in *Dennis* v. *United States*, 341 U. S. 494 (1951). By eliminating the test of "present" or "imminent" when the evil sought to be prevented is very grave, the element of *proximity*, which is the gist of the orthodox clear and present danger rule, is destroyed. See dissenting opinion of Mr. Justice Douglas in *Dennis* v. *United States, supra*, 581, 587–91. And, in this way, the courts would in fact abdicate their control over the legislative decisions as to the limitations on the right of free press and speech imposed by the statutes touching the crime of sedition. See Rostow, *The Democratic Character of Judicial Review*, 66 Harv. L. Rev. 193, 217–24 (1952) ; Chafee, *The Blessings of Liberty* (1956) 85. *Cf.* Richardson, *Freedom of Expression and the Courts*, 65 Harv. L. Rev. 1 (1951) ; Mendelson,

*Clear and Present Danger-From Schenck to Dennis*, 52 Colum. L. Rev. 315, 330–31 (1952); *Clear and Present Danger Reexamined*, 51 Colum. L. Rev. 98, 104–105 (1951). Thus, I believe that this Court should abide by the rule laid down in *Pennsylvania* v. *Nelson*, 350 U. S. 497 (1956), and dispense with other considerations which (expressly or impliedly) call for a pronouncement on the constitutional problems noted. Of course, in the present case there is no basis whatever for determining whether or not the rule in the *Dennis* case governs, under the clause of the Constitution of the Commonwealth of Puerto Rico which guarantees free speech and press.

---

MR. JUSTICE NEGRÓN FERNÁNDEZ with whom MR. JUSTICE MARRERO concurs, dissenting.
December 14, 1956.

I did not agree with the reversal of the judgment in this case and timely voiced my dissenting vote. The reversal having been voted by a divided majority of Court, stating in separate opinions the reasons leading to the same result, I feel it is also appropriate to explain briefly my reasons for dissenting.

It was charged that defendant in this case "illegally, maliciously, criminally, willfully, and knowingly, being an active Communist . . . , made statements and propaganda among different groups of persons promoting, advocating, advising, and preaching the necessity, desirability, and expediency of overthrowing, paralyzing, and subverting the Insular Government of Puerto Rico and the political subdivisions thereof by means of force and violence, *all of which the defendant herein carried out at a time when a revolt was under way, incited by members of a group known as 'Nationalist Party of Puerto Rico,' aimed at securing the separation of Puerto Rico from the United States by means of force and violence.*" (Italics ours.)

We cannot overlook a significant fact which, in my opinion, renders inapplicable the holding in *Pennsylvania* v.

*Nelson*, 350 U.S. 497, relied upon to maintain that the offense charged to appellant is outside the orbit of Act No. 53 of June 10, 1948 (Spec. Sess. Laws, p. 170) : [1] that the acts charged—promoting, advocating, advising, and preaching the necessity, desirability, and expediency of overthrowing, paralyzing, and subverting the Insular Government of Puerto Rico and the political subdivisions thereof by means of force and violence—were carried out at a time when a revolt incited by members of the Nationalist Party, aimed at the same purpose and by the same means, was under way.

If in this case it had not been alleged or proved that acts of such a nature took place while a Nationalist revolt was under way, in which force and violence were used in order to overthrow the Insular Government, I would have been inclined to agree that, in the light of the holding in the *Pennsylvania* v. *Nelson* case, *supra*, the jurisdiction to prosecute and try appellant herein could have rested exclusively with the United States District Court for Puerto Rico. However, in view of the averments and facts of this case, he was, in my opinion, properly tried by the lower court. Appellant, who in his testimony before the lower court admitted that he was an active Communist and was engaged in Communist propaganda for many years, took advantage of the fact that a Nationalist armed revolt was in full swing to advocate by word of mouth the overthrow of the Insular Government by means of force and violence. Such preachings constituted a coercive and inciting force for continuing the revolt already under way, aimed at overthrowing the Insular Government by the violent means which were being employed at that very moment. In view of such situation, it matters not that his teachings were prompted by the objectives of the Communist conspiracy; his activity ceased to be an isolated factor and was transformed into an active

---

[1] Act No. 13 of December 20, 1950 (Spec. Sess. Laws, p. 368), amending Act No. 53, does not apply since it is subsequent to the acts charged in the information.

ingredient of the conspiracy which was being plotted, aimed at achieving the proximate objective of the latter, which was in full swing.

. In this case the *Nelson* case cannot bar, under such circumstances, the exercise of our jurisdiction. Appellant's preachings, though they responded to the objective of the Communist conspiracy to overthrow our government, were integrated into an ostensible activity of another conspiracy which, though having a non-Communist objective, had the same proximate purpose.

Independently of the objective of appellant's preachings —Communist conspiracy to establish a republic of that type by overthrowing the Insular Government—his activity became a part of the other conspiracy—the Nationalist—and in both, as established by the evidence, the *proximate common purpose* was the overthrow of the established government of Puerto Rico by means of force and violence. Our power to prosecute appellant for violation of our laws cannot be measured by the remote finality which encouraged his preachings when there is, as in the present case, a proximate finality which started it on its way, taking advantage of the opportunity that another conspiracy, which was in full swing, gave him.

Whatever effect the holding in the *Nelson* case might have on the power of the States of the Union to punish Communist subversive activities aimed at overthrowing state governments, Puerto Rico can not be deprived, under the facts of this case, of its power to protect its own government against the danger of such overthrow when the Communist propaganda becomes a part—and not merely coincides—by its own and inherent subversive condition, taking advantage of a propitious occasion, of Nationalist activities given to force and violence in an ostensible attempt to overthrow the government. To deprive Puerto Rico of the power to protect its own government against such danger, under the peculiar

circumstances of the Puerto Rican reality, would amount to rendering it impotent by juridical submission and also to depriving the national effort, in the limited sphere in which it would concur, of an ally of inestimable value in its integrated fight against Communist conspiracy.

Separate opinion of MR. JUSTICE BELAVAL.

December 14, 1956.

I am not in accord with the illustrious opinion of my brother, Mr. Justice Sifre, that the case of *Pennsylvania* v. *Nelson*, 350 U. S. 497, has stripped us of our power in this case, on the ground that the United States Congress has covered the field of sedition and subversive acts by proper legislation. I believe, on the contrary, that we should apply in this situation of facts the case of *People of Puerto Rico* v. *Shell Company (P. R.), Ltd.*, 302 U. S. 253, which consecrates the principle that, though the field is covered by the United States Congress, our Legislative Assembly could enact a similar statute to suit our local needs. Hard as I have tried to reason the problem, I fail to see that any conflict may arise from letting each country deal with contemporary Communism as its own emergencies and circumstances may call for. The decision in the *Nelson* case is based on the practical philosophy of unifying the action of the Federal Government within the peculiar composition of semi-sovereign states which make up the American nation. However, I do not believe that that practical philosophy would be so wise when applied to Puerto Rico. What may seem advisable in the United States at a particular moment might not be advisable in Puerto Rico, and vice versa. Furthermore, it does not seem prudent at this moment, when we are faced with a possible conflict between the American law and ours, to apply the foregoing principle of federal relationship, since, as far as we are concerned, it is entirely obsolete.

As to this aspect, I prefer the treatment of the problem by Mr. Chief Justice Snyder in his opinion.